**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CECIL THOMPSON, | No. 4:22-CV-01159 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| CITY OF WILLIAMSPORT, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION**

**NOVEMBER 17, 2023**

## I.    BACKGROUND

In June 2023, Plaintiff Cecil Thompson filed a seven-count amended complaint against Defendants the City of Williamsport ("Williamsport"), Lycoming County ("Lycoming"), Jason P. Bolt, Sherry Clark, Dayna Sierra, Zaria Cooper, and Rose View SNF, LLC, doing business as Roseview Nursing and Rehabilitation Center ("Rose View").[1] Cooper and Rose View were subsequently dismissed from the suit.[2]

On June 10, 2023, Williamsport and Bolt filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim; Lycoming filed its motion to dismiss on June 14, 2023.[3] The motions are now ripe for

---

[1]    Doc. 37.
[2]    Doc. 59.
[3]    Docs. 38, 43.

disposition; for the reasons that follow, they are granted.  However, Plaintiff will be provided leave to amend his complaint.

## II.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[4] and *Ashcroft v. Iqbal*,[5] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[6] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[7]

---

[4]    550 U.S. 544 (2007).
[5]    556 U.S. 662 (2009).
[6]    *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[7]    *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

When deciding a motion to dismiss, a court generally considers only the allegations in the complaint, exhibits attached thereto, and facts of public record.[8] Normally, to go consider anything beyond those sources, a motion to dismiss must be converted to a motion for summary judgment.[9]  But consideration of materials outside the complaint is not completely barred on a 12(b)(6) motion.  Courts may consider any documents that are integral or explicitly relied upon in the complaint.[10] "However, before materials outside the record may become the basis for a dismissal, several conditions must be met."[11]  "For example, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document."[12]  It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document.[13]  In this matter, this Court finds that these conditions have been met, and will consequently consider Defendant's attachments.

### B.    Facts Alleged in the Amended Complaint

The facts alleged in the amended complaint, which this Court must accept as true for the purposes of this motion, are as follows.

---

[8]   *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010).
[9]   *See* Fed. R. Civ. P. 12(d).
[10]   *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014).
[11]   *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).
[12]   *Id.*; *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Alternative Energy, Inc. v. St. Paul Fire and Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001).
[13]   *Faulkner*, 463 F.3d at 134.

### 1.     The incident

On May 18, 2020, Dayna Sierra and her mother Sherry Clark returned to their shared double home after running errands.[14] While they were unloading groceries, Sierra noticed a tall, thin black male watching them from behind a tree in an alleyway (the "assailant").[15] The man was wearing a light blue surgical mask and a gray hoodie with black stripes.[16] Sierra alerted Clark about the man watching them.[17] While Sierra was next door with her husband, Clark was inside her home putting groceries away.[18] With Clark upstairs, the assailant knocked on her back door.[19] Clark's ten-year-old granddaughter Jada answered the door, and the assailant asked: "Is Lisa home?"[20] Clark's grandson Christian came to the door, and the assailant asked him to speak with Lisa as well.[21] He informed the assailant that no one named Lisa lives there.[22]

The assailant then brandished a gun from his waistband and held it against Christian, telling him and his two sisters to "get on the ground and be quiet" or he'd shoot them.[23] The assailant led the three children upstairs to the bedroom, where

---

[14]   Doc. 37 ¶14.
[15]   *Id.*
[16]   *Id.*
[17]   *Id.* ¶15.
[18]   *Id.* ¶16.
[19]   *Id.*
[20]   *Id.*
[21]   *Id.*
[22]   *Id.*
[23]   *Id.* ¶17.

Clark was, and pointed the gun at Clark's head.[24] He again stated that they should sit down and be quiet, or he would kill them.[25]

Clark feigned sitting on her bed, reached for a "flashlight/billy club" she hid in her bedroom, and struck the assailant in the arm holding his gun.[26] Clark then repeatedly struck the intruder about his body, beginning a struggle which brought the pair into the hallway.[27] The assailant struck Clark in the head with the butt of his firearm, sending her to the floor, and Clark beat him about his lower body and legs. The assailant began stepping on her legs and feet while she was laying on the ground and told Clark to stop striking him. Clark regained her footing and chased the assailant down the stairs, where he left his handprint on a picture frame.[28] He made his way to the kitchen, where the struggle continued until Clark pushed the assailant out of her back door.[29] Clark immediately called the police.[30]

While these events unfolded, Cecil Thompson was having a less eventful night playing Xbox at his home.[31]

---

[24]   *Id.*
[25]   *Id.*
[26]   *Id.* ¶18.
[27]   *Id.*
[28]   *Id.* ¶19.
[29]   *Id.*
[30]   *Id.* ¶20.
[31]   *Id.* ¶39.

### 2.      The investigation

Clark, Sierra, and their families gave statements to police officers that same day, and the following day.[32] In the aftermath of the incident, police officers extracted photographs of the assailant from a surveillance camera outside of the victims' residence, and distributed those images to officers.[33]

Meanwhile, Thompson repeatedly, and unknowingly, walked past the home of victims Clark and Sierra on High Street.[34] Thompson worked at Rose View, and would often walk down High Street while walking to and from work.[35]

On May 21, 2020, two days after the incident, Deputies Warden and Whipple of the Lycoming County Sheriff's Department were driving east on High Street, where the victims live, when they observed Thompson walking along the street.[36] Thompson, like the intruder, is a tall, yet thin, black male.[37] Thompson was wearing a black hooded sweatshirt with gray stripes.[38]

Deputy Warden later stated in his incident report that "the photos [he] received are somewhat pixelated and it was hard to see any distinct facial features other than black glasses."[39] He also stated that Thompson "appeared to be younger than the

---

[32] *Id.*
[33] *Id.* ¶22.
[34] *Id.* ¶26.
[35] *Id.* ¶¶26-27.
[36] *Id.* ¶21.
[37] *Id.* ¶25.
[38] *Id.* ¶21.
[39] *Id.* ¶22.

individual depicted in the photos."[40] Nevertheless, he and Deputy Whipple monitored Thompson because they believed that he fit the description of the assailant.[41] After a third Deputy, Deputy Heath, arrived, the three officers approached Thompson and asked him for his identification.[42] Thompson cooperated, and told the officers that he had been walking home from his shift at a nearby nursing home, Rose View.[43] At no point did the three deputies attempt to determine whether Thompson had any injuries due to the confrontation between the assailant and Clark.[44] Nor did they collect any DNA or fingerprint evidence from Thompson at that time.[45]

Over the subsequent two months, between May 21, 2020 and July 28, 2020, Clark, Sierra or other members of their household sent law enforcement officers at least five photographs of Thompson.[46]  They had noticed Thompson walking past their house, and believed him to be "the same individual who broke into their home."[47] Clark's family contacted Officer Bolt, who works for the Williamsport Police Department, on June 5, 2020, to state that they had "immediately recognized" Thompson as the intruder while he walked past their home.[48]

---

[40] *Id.* ¶23.
[41] *Id.* ¶22.
[42] *Id.* ¶23.
[43] *Id.*
[44] *Id.* ¶24.
[45] *Id.*
[46] *Id.* ¶25.
[47] *Id.*
[48] Doc. 38-2.

Then, on June 25, 2020, Bolt and other Williamsport Police Department officers "raided" the Rose View office. Thompson alleges that they did so "with rifles and/or other weapons drawn."[49] They then "confronted" Zaria Cooper, who worked in the Human Resources Department at Rose View.[50] Officers showed Cooper the image of Thompson and asked if it depicted him.[51] Cooper stated that it did; Thompson states that she was "arguably compelled to do so by the presence of heavily armed police officers who specifically said they were looking for Plaintiff Cecil Thompson."[52] At no time did Bolt ask Thompson whether he was depicted in the photograph, search his body for contusions or scars from the incident, or investigate Thompson's whereabouts on the date and time of the home invasion.[53] A search warrant was executed for Thompson's home to attempt to locate the intruder's firearm or matching clothing, but neither was found.[54]

### 3.    The arrest and prosecution

On July 29, 2020, Bolt and other Williamsport officers arrested Thompson during his workday at Rose View.[55] Thompson then consented to a buccal swab, which was sent to be compared with the DNA obtained from the crime scene.[56] Meanwhile, Thompson was charged with five felonies and eleven misdemeanors by

---

[49]   Doc. 37 ¶28.
[50]   *Id.*
[51]   *Id.*
[52]   *Id.*
[53]   *Id.* ¶¶29-31.
[54]   *Id.* ¶32.
[55]   *Id.*
[56]   *Id.* ¶33.

the Lycoming County District Attorney's Office (the "DA's Office"), including Burglary, Unlawful Restraint of a Minor, Terroristic Threats with Intent to Terrorize Another, Simple Assault, and Possession of a Weapons.[57] The case was brought by Assistant District Attorney Michael B. Sullivan.[58] The DA's Office then pursued a bail set at $750,000, which Thompson could not afford to pay.[59]

Thompson sat in prison for at least four months.[60] On September 29, 2020, two separate examiners compared Thompson's DNA and fingerprint samples with the samples taken from the picture frame and flashlight/billy club taken from the crime scene.[61] Both examiners determined that the DNA did not match.[62] However, the DA's Office did not inform Thompson about the test results.[63] Instead, it waited until November 20, 2022, to disclose this evidence to Thompson and his public defender.[64] Upon this disclosure, Thompson's counsel successfully reduced his bail to $25,000, which he paid.[65] Because his prosecution continued, Thompson sent a Notice of Intent to the DA's Office on December 3, 2020, informing it that he intended to pursue a civil action against it.[66] An affidavit was also obtained on

---

[57] *Id.* ¶¶13, 33.
[58] *Id.* ¶6
[59] *Id.* ¶34.
[60] *Id.* ¶35.
[61] *Id.* ¶36.
[62] *Id.*
[63] *Id.* ¶38.
[64] *Id.*
[65] *Id.* ¶35.
[66] *Id.* ¶40; Doc. 37-4.

December 27, 2020, from a Microsoft employee, confirming that Thompson had been playing Xbox at the time of the incident.[67]

Despite all these developments, the District Attorney continued to prosecute Thompson's case for an additional two years, until September 2, 2022.[68] Thompson alleges that the District Attorney was motivated to prolong his prosecution because of his Notice of Intent.[69] He states that unspecified personnel from the DA's Office offered to withdraw all criminal charges against him if he agreed to drop this lawsuit, and thus tacitly admitted both that they did not believe Thompson to be guilty, and that they prolonged the suit in bad faith.[70] Thompson's case was eventually nol prossed.[71]

This Court previously stayed Thompson's civil proceedings until his criminal prosecution concluded.[72] Thompson then filed a Status Report with the Court on March 17, 2022, informing it that his prosecution had concluded.[73]

Thompson now sues Defendants Bolt, Williamsport and Lycoming (as well as Clark and Sierra) for various constitutional violations under 42 U.S.C. § 1983 and malicious prosecution; he sues Bolt for false arrest, false imprisonment, intentional infliction of emotional distress, assault, and battery.

---

[67]   Docs. 37 ¶39; 37-3.
[68]   *Id.* ¶¶40, 43.
[69]   *Id.* ¶40.
[70]   *Id.* ¶89.
[71]   *Id.* ¶43.
[72]   *Id.* ¶42.
[73]   *Id.* ¶44; Doc. 6.

## C.    Analysis

### 1.    Count I: Section 1983 Claims

Count I of the amended complaint is brought under 42 U.S.C. § 1983 against all defendants. Section 1983 provides a cause of action for violations of the United States Constitution under color of state law; it is not a substantive source of rights.[74] Count I states that Defendants' actions "denied Plaintiff equal protection of the law in violation of the United States Constitution, the 1st Amendment, the 4th Amendment, the 5th Amendment, the 8th Amendment, the Due Process Clause of the 14th Amendment, the Equal Protection Clause of the 14th Amendment, the Substantive Due Process rights of the 14th Amendment, and/or 42 U.S.C. § 1983."[75]

Before proceeding to the merits of these claims, the Court notes that Count II states a claim against Williamsport and Lycoming for "Monell and Brady/Giglio violations."[76] But *Monell v. Department of Social Services* is simply a decision clarifying how liability for constitutional violations can attach to municipal bodies under Section 1983; it is not a unique cause of action. And *Brady v. Maryland*[77] and *Giglio v. United States*[78] are decisions clarifying when the failure to disclose exculpatory evidence violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The entirety of Count II, then, is merely stating

---

[74] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).
[75] Doc. 37 ¶50.
[76] Doc. 37 at 11.
[77] 373 U.S. 83, 87 (1963).
[78] 405 U.S. 150, 154 (1972).

the alleged basis for the City of Williamsport and Lycoming County's liability under Section 1983 for violations of the Fourteenth Amendment, as already pled against those defendants in Count I. The Court will accordingly read these two Counts in tandem rather than as separate causes of action.

### a.   Section 1983 Claims Against Bolt

Not until Thompson's Brief in Opposition does he clarify which facts support which causes of action, and even then he specifies little connection to Bolt. Thompson's First Amendment claim, he explains, is based on the fact that Thompson's prosecution was prolonged for two years in retaliation for his notice of intent to sue.[79] The Eighth Amendment claim is based on the setting of excessive bail, at $750,000.[80] And the Fourteenth Amendment Claim is, at least in part, based on Assistant District Attorney Sullivan's alleged *Brady* violations.[81] Whatever the merits of these alleged constitutional injuries, no allegation suggests that Officer Bolt had any part in them. Nothing indicates any involvement by Bolt in prolonging Thompson's prosecution, setting his bail, or failing to disclose exculpatory evidence.

---

[79] Doc. 55 at 6.
[80] *Id.*
[81] *Id.*

So Thompson's First and Eighth Amendment claims are dismissed with prejudice,[82] and his Fourteenth Amendment claim is dismissed without prejudice.[83]

Thompson also alleges that his arrest by Bolt, which was "bereft of any substantive evidence in support of probable cause," violated the Fourth, Fifth, and Fourteenth Amendments.[84] The Court will attempt to comprehend the theories suggested by Thompson's pleadings, but it will not develop them on his behalf.

Many of Thompson's pleadings take umbrage with the thoroughness of Bolt's investigation, complaining that Bolt should have checked him for bruises, inquired into his alibi, and tested DNA evidence before arresting him.[85] If this is meant to plead that Thompson had a constitutional right to a more thorough investigation by Bolt before he was arrested, then the claim fails. The viability of "failure to investigate" claims is unclear in this Circuit, but our Court of Appeals has indicated

---

[82] As to the First Amendment claim, it is solely the decision of a prosecutor to prolong a prosecution, and nothing in the amended complaint suggests any role by Bolt in interfering with Sullivan's discretion. *See Brady*, 373 U.S. at 88 (prosecutor is the "architect" of the criminal proceeding). As to the Eighth Amendment claim, without opining on the merits of whether such a claim could even be brought under Section 1983, Bolt was removed from the bail by two layers of discretion. The bail was recommended by Sullivan, and actually set by the Judge; so Bolt had no personal involvement, and causation has not been proved. The Court can conceive of no set of facts under which Bolt could be liable for either claim.

[83] The amended complaint suggests that police officers were involved in arranging the DNA test before it was received by Sullivan, but the timeline of disclosure and the role of the different police departments and officers is not specified. No claim has been alleged, but it is conceivable that a more thorough explanation of the DNA test could trace Bolt's involvement to the delay in disclosing this exculpatory evidence. *See Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety—Div. of State Police*, 411 F.3d 427, 442-43 (3d Cir. 2005) (recognizing that *Brady* obligates officers to disclose exculpatory information to the prosecutor, and that this failure provides a basis for that officer's liability under Section 1983).

[84] Doc. 37 ¶50.

[85] *Id.* ¶¶ 24, 29, 30, 31, 33, 38, 39, 63, 68-70.

that such a claim is not "clearly established" here, so any such claim would fail under qualified immunity.[86] The Supreme Court of the United States has also cast considerable doubt on such claims.[87]

Thompson also pleads false arrest, false imprisonment, and malicious prosecution in other counts, yet fails to specify whether these causes of action are based on Federal or state law. Even if Thompson meant to plead these theories under Federal law, they are unavailable as now alleged.

Each of these constitutional torts shares the core element that probable cause must be lacking. False arrest and false imprisonment are generally interchangeable, requiring that the plaintiff was arrested or imprisoned without probable cause.[88] Likewise, malicious prosecution claims require, along with other elements, that the proceeding was initiated without probable cause.[89] While malicious prosecution requires that the defendant initiate a criminal proceeding, an officer can fulfill this

---

[86] *See Harvard v. Cesnalis*, 973 F.3d 190, 207 (3d Cir. 2020); *Geness v. Cox*, 902 F.3d 344, 354 n.5 (3d Cir. 2018); *White v. Andrusiak*, No. 14-7045, 2015 U.S. Dist. LEXIS 110076, at *2-3 (E.D. Pa. Aug. 19, 2015); *Wright v. City of Phila.*, 229 F.Supp.3d 322, 332 n.3 (E.D. Pa. 2017).

[87] *Baker v. McCollan*, 443 U.S. 137, 145-46 (1979) (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person")).

[88] *Cesnalis*, 973 F.3d at 199 (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012)); *Wallace v. Kato*, 549 U.S. 384, 389 (2007).

[89] "To prevail on a malicious prosecution claim, a plaintiff must demonstrate that: '(1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in [the] plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Cesnalis*, 973 F.3d at 206 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)).

element by filing an affidavit of probable cause.[90] In addition to satisfying probable cause, each claim must also defeat Bolt's qualified immunity defense.

And any false arrest, false imprisonment, or malicious prosecution claim is barred by qualified immunity. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional rights, and (2) that the right was 'clearly established' at the time of the challenged conduct."[91] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[92]

Ordinarily, qualified immunity presents an "astoundingly high bar" to these constitutional torts where an arrest occurred pursuant to a warrant identifying the plaintiff.[93] Where an alleged constitutional violation involves such an arrest, "the fact that a neutral magistrate has issued the warrant is the clearest indication that the officers acted in an objectively reasonable manner"[94] and the magistrate is given "great deference."[95] The arrest is valid unless "it is obvious that no reasonably

---

[90]   *See Berg v. Cnty of Allegheny*, 219 F.3d 261, 272 ("§ 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set forth the arresting officer in motion"); *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (filing affidavit of probable cause with false statement or omission can support false arrest claim).

[91]   *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

[92]   *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (cleaned up).

[93]   *Morgan v. Commonwealth*, No. 4:23-CV-00872, 2023 U.S. Dist. LEXIS 177374, at *18 (M.D. Pa. Oct. 2, 2023).

[94]   *Messerschmidt v. Millender*, 565 U.S. 535, 546-57 (2012).

[95]   *United States v. Leon*, 468 U.S. 897, 913-14 (1984).

competent officer would have concluded that a warrant should issue."[96] The warrant must be "so lacking in indicia of probable cause" that "it is apparent from a 'simple glance' at the face of the warrant itself, not a defect that would 'become apparent only upon a close parsing of the warrant application.'"[97] "The threshold for establishing this exception is a high one"[98] because "an officer cannot be expected to question the magistrate's probable-cause determination."[99] The same is true for prosecutions initiated by the affidavit of probable cause; indeed, the claim is "twice disadvantaged" as it has also been approved by a prosecutor.[100]

Under this standard, Thompson's claim fails. Whether or not probable cause existed, Bolt's affidavit contains far more detail than those affidavits so deficient that an officer can be liable for false arrest even when they are approved by a magistrate. Most deficient warrants in this circuit are supported by "bare bones" or "skeletal" affidavits containing a few general sentences.[101] The affidavit also directly states that Thompson was visible on the surveillance footage depicting the assailant and indicates that he was identified by two victims and Cooper. Such an affidavit is

---

[96] *Malley v. Briggs*, 475 U.S. 335, 342 (1986).
[97] *Armstrong v. Asselin*, 734 F.3d 984, 992 (9th Cir. 2013) (citing *Messerschmidt*, 565 U.S. at 556).
[98] *Messerschmidt*, 565 U.S. at 547.
[99] *United States v. Leon*, 468 U.S. 897, 922-923 (1984).
[100] *Fiore v. City of Bethlehem*, 510 F.App'x 215, 220 (3d Cir. 2013); *Handy v. Palmiero*, No. 17-3107, 2019 U.S. Dist. LEXIS 142639, at *18 (E.D. Pa. Aug. 22, 2019).
[101] *Fiore*, 510 F.App'x at 221; *United States v. Pavulak*, 700 F.3d 651, 664 (3d Cir. 2012) (collecting examples of "bare bones" affidavits).

not so deficient of probable cause on its face that an officer would be expected to question a magistrate's approval.

This assumes, of course, that Bolt's affidavit was truthful and complete. If it was not, then a basis for liability exists where the officer (1) "knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that create a falsehood in applying for a warrant," and (2) "such statements or omissions are material, or necessary, to the finding of probable cause."[102] Under such circumstances, "the protection afforded by the magistrate's review [of the affidavit] is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are."[103]

Although several discrepancies between Thompson's allegations and Bolt's affidavit are immediately apparent, Thompson does not allege anywhere in the amended complaint that Bolt omitted information from his affidavit knowingly, or with a reckless disregard for the truth. He only alleges that Bolt made unspecified false statements to the District Attorney at some unspecified point in time.[104] In fact, it was Defendants, not Thompson, who attached the affidavit of probable cause to their responsive pleadings in the first place.[105]

---

[102] *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (citing *Sherwood v. Mulvill*, 113 F.3d 396, 399 (3d Cir. 1997)).

[103] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).

[104] Doc. 37 ¶58.

[105] Doc. 38-2.

In sum, Thompson has not pled a cause of action sufficient to plausibly defeat this qualified immunity barrier, as stating such a claim would require Thompson to lay out which omissions were knowingly or recklessly made by Bolt. The Court would then conduct a "literal, word by word reconstruction[] of [the] challenged affidavit" to determine whether there would be probable cause to arrest Thompson after correcting for the misrepresentations.[106] But as it stands, despite the existence of discrepancies between Bolt's affidavit and Thompson's allegations, Thompson has not pled that Bolt made any intentional false statement or omission in his affidavit.

Courts in this Circuit have also held that a malicious prosecution claim may be brought if an initially lawful prosecution is rendered unlawful, for example because probable cause has dissipated.[107] So where qualified immunity would bar such claims based upon a magistrate's approval of the initial arrest, Thompson could still plead them where subsequent events revealed the absence of probable cause. But that cause of action is only available against an officer "where an officer's involvement does not end with the issuance of a warrant or the act of arrest."[108]

---

[106]   *Dempsey*, 834 F.3d at 470.

[107]   *Johnson v. Knorr*, 477 F.3d 75 (3d Cir. 2007); *Kelly v. Jones*, 148 F.Supp. 3d 395, 402 (E.D. Pa. Apr. 17, 2015) (distinguishing between actions based on the suspect being taken into custody, and actions based on the suspect continuing to be held in custody), *order vacated in part*, No. 14-CV-4317, 2015 U.S. Dist. LEXIS 116433 (E.D. Pa. May 13, 2015), *order reinstated*, 148 F.Supp. 3d 395, 406 (E.D. Pa. Nov. 24, 2015).

[108]   *Kelly*, 148 F.Supp. 3d 395, 407 (E.D. Pa. Nov. 24, 2015) (reinstating initial order) (citing *Johnson*, 477 F.3d at 79); *see also Thompson v. City of Phila.*, 290 F.Supp. 3d 371, 379 (E.D. Pa. 2018).

Thompson's only attempt to plead Bolt's post-arrest conduct is contained in a single paragraph: "Defendants Clark, Sierra, Cooper, Rose View, Bolt, and/or Defendant City of Williamsport either knowingly provided false information to Defendant Lycoming County's district attorney's office, and/or knowingly provided incomplete, misleading information to Defendant Lycoming County's district attorney's office, which resulted in the detention of the Plaintiff."[109]

This is far too vague. It fails to specify what information was knowingly incomplete, misleading or false, when that information was provided, and who among the six parties listed provided it. On a motion to dismiss, Thompson need not prove all of this, but he must at least reform his allegation so that it is more than a "threadbare recital[] of the elements of [this] cause of action."[110] No factual foundation is provided to these allegations of false information or their timing, so the Court cannot find that they are plausibly alleged.

### b.   Section 1983 Claims Against City of Williamsport and Lycoming County

As set out in *Monell v. New York Department of Social Services*, a municipal body is a "person" who can be liable under Section 1983.[111] But a municipality can only be liable for its own actions; it cannot be vicariously liable for the actions of its employees. A municipal body acts through "a policy statement, ordinance,

---

[109]   Doc. 37 ¶69.
[110]   *Ashcroft v. Iqbal*, 556 U.S. 662, 677-679 (2009).
[111]   436 U.S. 658, 690 (1978)

regulation, or decision officially adopted and promulgated by that body's officers."[112] This includes unconstitutional practices which are "so permanent and well settled as to constitute a custom or usage with the force of law."[113] One such unconstitutional custom includes that of a "deliberate indifference to constitutional rights" through a failure to train or failure to supervise.[114] Finally, regardless of which method is used to show a municipality's actions, it must be shown that those actions were the "moving force" behind a constitutional violation, which also requires that a constitutional violation occurred in the first place.[115]

Thompson alleges that his various constitutional violations were "all pursuant to a policy/policies, procedure(s), and/or custom(s) held and/or regularly enacted by said Defendants."[116] A Section 1983 plaintiff, however, cannot survive dismissal through "conclusory allegations against defendants as a group."[117] An adequate allegation cannot, where multiple defendants "occupy different positions and presumably have distinct roles in the alleged conduct," engage in "impermissibly vague group pleading;" it must instead specify "which defendants engaged in what

---

[112] *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).

[113] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117 (1988).

[114] *Wood v. Williams*, 568 F.App'x 100, 105 (3d Cir. 2014) (quoting *City of Canton*, 489 U.S. at 388, 392)).

[115] *Monell*, 436 U.S. at 694; *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 877 F.3d 136,145 & n.6 (3d Cir. 2017).

[116] Doc. 37 ¶¶51, 58.

[117] *Galicki v. New Jersey*, No. 14-169, 2015 U.S. Dist. LEXIS 84365, at *2 (D.N.J. June 29, 2015).

wrongful conduct."[118] Here, the complaint is bereft of any policy or procedure at all, so this language lacks factual foundation, and is therefore conclusory.

As Thompson points out, an act by an official decisionmaker with final authority in the relevant area can be considered a policy attributable to the municipality itself.[119] But Thompson goes on to maintain that Bolt "promulgated the deprivation of the Plaintiff's constitutional rights."[120] Using the word "promulgate" does not turn officers into policymakers, and no allegation shows that Bolt had any "final decision-making authority" for the City of Williamsport, Lycoming County, or the Williamsport Police Department.

Thompson also argues that "Defendants" "opted to promulgate their vengeful pursuit of the Plaintiff's prosecution for another two years."[121] Assuming that the relevant actor is Assistant District Attorney Sullivan, assistant district attorneys are not policymakers; only the district attorney himself can "promulgate" policies under Pennsylvania law.[122] In any case, district attorneys have a "dual or hybrid status" as both state and county-level actors.[123] When a prosecutor engages in conduct in

---

[118] *Falat v. Cnty of Hunterdon*, No. 12-8604, 2013 U.S. Dist. LEXIS 37398, at *3 (D.N.J. Mar. 19, 2023).

[119] Doc. 55 at 7 (citing *Parker v. Sch. Dist. of Phila.*, 364 F.Supp. 3d 738 (E.D. Pa. 2018)).

[120] *Id.*

[121] Doc. 55 at 7; Doc. 56 at 7.

[122] *See McMillian v. Monroe Cnty*, 520 U.S. 781, 783 (holding that state law determines whether an actor has final policy-making authority); *Whitefield v. City of Phila.*, 587 F.Supp. 2d 657, 671 (E.D. Pa. 2008) ("[C]ourts in this district have routinely held that Assistant District Attorneys cannot be policy makers for Section 1983 purposes because they lack unreviewable discretion as a matter of law").

[123] *Coleman v. Kaye*, 97 F.3d 1491, 1499 (3d Cir. 1996); *Wallace v. Powell*, 2010 U.S. Dist. LEXIS 19919, at *18 (M.D. Pa. Mar. 1, 2010).

furtherance of a criminal prosecution, he acts as a state actor, and so is absolutely immune under the Eleventh Amendment of the United States Constitution.[124]

Finally, Thompson alleges a failure to train and failure to supervise claim against Williamsport and Lycoming County. For a municipality's failure to train or supervise to constitute deliberate indifference, a plaintiff must show "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves making a difficult choice or a history of employee mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."[125] A failure to train allegation must "identify a failure to provide specific training that has a causal nexus with th[e plaintiff's] injuries," and it must identify "the specific training th[at] should have [been] offered."[126]

"Liability cannot rest only on showing that the employees 'could have been better trained or that additional training was available that would have reduced the overall risk of continued injury.'"[127] The training must be so deficient that it demonstrates the municipality's deliberate indifference to the kind of injury suffered by the plaintiff.[128] To survive dismissal, Section 1983 claims pled under *Monell* must be specific enough to contend with the obviously alternative explanation that the

---

[124] *Imbler v. Pachtman*, 424 U.S. 409, 430-41 (1976); *Carter v. City of Phila.*, 181 F.3d 339, 352 (3d Cir. 1999).

[125] *Carter*, 181 F.3d at 357.

[126] *Reitz v. Cnty of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997) (citing *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991)).

[127] *Thomas v. Cumberland Cnty*, 749 F.3d 217, 226 (3d Cir. 2014).

[128] *Canton v. Harris*, 489 U.S. 378 at 388, 392 (1989).

plaintiff's constitutional injury was solely caused by the misconduct of the municipal employees themselves. The plaintiff is not expected to append a fully developed record to his complaint before discovery, but it must be plausible that a constitutionally deficient training failure actually caused the constitutional violation.

Thompson's training and supervision claims are all conclusory. He alleges four failures to "train and/or supervise."[129] When he alleges that "defendants city of Williamsport and/or Lycoming County failed to respectively train and/or supervise their Police Department and District Attorney's Office, respectively,"[130] Thompson does not say who failed in what way.[131] When he alleges that the training or supervision failure was "in the timely and proper collection and disclosure of exculpatory Brady and/or Giglio material,"[132] he fails to say what training or supervision existed, and what training or supervision was due.[133] For example, the allegations do not clarify whether no training or supervision was in place at all, or whether the training or supervision already in place was insufficient. The allegations also skip a step between the training deficiency and plaintiff's constitutional violation, often alleging that there was a lack of training, "where, as here," specific

---

[129]   Doc. 37 ¶¶ 60-63.
[130]   *Id.* ¶¶ 60-61.
[131]   *See Falat*, 2013 U.S. Dist. LEXIS 37398, at *3 (complaint must specify which actors engaged in what wrongful conduct).
[132]   *Id.* ¶60.
[133]   *See Reitz*, 125 F.3d at 145 (citing *Colburn*, 946 F.2d at 1030) (failure to train allegation must identify the specific training that should have been offered).

factual circumstances were present.[134] Thompson must first explain what the deficient training program or supervision regime was, and then explain how it caused the constitutional violation.

### 2. State law false arrest and malicious prosecution claims against Bolt

In Pennsylvania, false arrest claims are mostly identical to those under Section 1983, except that they do not require a violation of the Federal constitution. "Under Pennsylvania law, false arrest is synonymous with false imprisonment."[135] The required elements are fulfilled where the plaintiff was detained without probable cause.[136] To establish a malicious prosecution claim under Pennsylvania law, "a party must establish that the defendants instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff."[137] "[A] successful case for malicious criminal prosecution is both rare and arduous."[138] "[U]nder Pennsylvania law (in contrast to federal law), an officer's arrest without probable cause, standing alone, satisfies the 'initiation' of a criminal prosecution element of the claim."[139] Therefore, as with Thompson's federal claims, his state law claims for false arrest and malicious

---

[134] *Id.* ¶¶61-63.

[135] *Alleyne v. Pirrone*, 180 A.3d 524, 543 (Pa. Cmwlth Ct. Mar. 9, 2018) (citing *Gagliardi v. Lynn*, 285 A.2d 109, 111 (Pa. 1971)).

[136] *Id.*

[137] *Bradley v. General Acc. Ins. Co.*, 778 A.2d 707, 710 (Pa. Super. Ct. 2001).

[138] *Alleyne*, 180 A.3d at 540.

[139] *Hunter v. Weber*, No. 1:22-CV-00068, 2023 U.S. Dist. LEXIS 125286, at *21 (W.D. Pa. July 19, 2023) (Lanzillo, M.J.).

prosecution turn on whether it is plausible that probable cause for his arrest was lacking.

Unlike his Federal claims, however, qualified immunity does not apply.[140] So the fact that Bolt's warrant was approved by a neutral magistrate does not shield Bolt from liability if probable cause was lacking. Bolt may still assert the defenses available under Pennsylvania state law, namely under official immunity as specified by 42 Pa.C.S. §§ 8545 – 8550. However, while acknowledging Thompson's false arrest claims under both state and Federal law, Bolt only raises the defense of qualified immunity, and cites Federal cases for it, rather than citing to the statute codifying official immunity under Pennsylvania law. The Court therefore assumes that Bolt did not intend to plead this affirmative defense.[141]

The probable cause analysis under Federal and Pennsylvania state law is essentially interchangeable.[142] Probable cause is a "totality of the circumstances" analysis.[143] "Probable cause exists if, at the moment the arrest was made, 'the facts and circumstances within the arresting officers' knowledge . . . were sufficient to warrant a prudent man in believing that [the person to be arrested] had committed or

---

[140] *See, e.g.*, *Wilson v. Jean*, 145 F.Supp. 434 (E.D. Pa. 2015) (dismissing federal false arrest claim based on qualified immunity but allowing a state false arrest claim to go forward because probable cause was lacking).

[141] If he did, the issue would be whether 42 Pa.C.S. § 8550 permitted Thompson's false arrest, false imprisonment, and malicious prosecution claims. The Court does not now opine on this issue.

[142] *Burns v. Patino*, No. 98-CV-5605, 1999 U.S. Dist LEXIS 10860, at *14 (E.D. Pa. July 8, 1999).

[143] *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

was committing an offense.'"[144] Evidence supporting probable cause need not be as strong as would be needed to support a conviction, and the officer need not make his determination based upon "the fine resolution of conflicting evidence required at trial,"[145] but there must be a "fair probability" that the person committed the relevant crime."[146]

"While 'a positive identification by a victim witness, without more, would usually be sufficient to establish probable cause . . . [i]ndependent exculpatory evidence or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist." [147] For example, the Third Circuit has opined that in "a scenario in which an officer knows about reliable, independent, exculpatory DNA evidence that contradicts a positive identification . . . 'the positive identification would not be enough' to outweigh such evidence."[148] But "[i]mportantly, probable cause is an objective inquiry based upon the information known to the officer at the time; a court does "not evaluate probable cause in hindsight."[149] Therefore, post-arrest knowledge

---

[144]  *Southerland v. Commonwealth*, 389 F.App'x 166, 168 (3d Cir. 2010) (quoting *Snell v. City of York*, 564 F.3d 659, 671 (3d Cir. 2009)) (cleaned up).

[145]  *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012).

[146]  *Wright*, 409 F.3d at 602.

[147]  *Shaffer v. City of Pittsburgh*, 650 F.App'x 111, 114 (3d Cir. 2016) (unpublished) (quoting *Wilson*, 212 F.3d at 790); *Round v. City of Phila.*, No. 19-3513, 2022 U.S. Dist. LEXIS 131205, at *44-45 (E.D.Pa. July 22, 2022); *Merkle v. Upper Dublin Sch. Dist.*, 211 F.3d 782, 790 (3d Cir. 2000); *see also United States v. Decoteau*, 932 F.2d 1205, 1207 (7th Cir. 1991); *Applewhite v. Twp. of Milburn*, No. 11-6957, 2013 U.S. Dist. LEXIS 145759, at *12-13 (D.N.J. Oct. 9, 2013) (quoting *United States v. Harness*, 453 F.3d 752, 754 (6th Cir. 2006)).

[148]  *Andrews v. Scuilli*, 853 F.3d 690, 702 (3d Cir. 2017) (quoting *Wilson*, 212 F.3d at 791).

[149]  *Florida v. Harris*, 568 U.S. 237, 249 (2013).

such as the fact that Thompson did not have bruises as the true perpetrator likely did, the fact that the September DNA test showed that his sample did not match the sample likely belonging to the actual perpetrator, and the Xbox affidavit, is not considered in this analysis.  I will now turn to the witness identifications.

First, the Court can quickly dismiss Cooper's identification of Thompson as entirely void in the probable cause analysis. Bolt disagrees with the allegation that Cooper identified Thompson on the day of his arrest, contending that Cooper's identification "would have been made before the arrest of Plaintiff as indicated in the Affidavit of Probable cause dated 7/28/20 – the date of Plaintiff's arrest."[150] Even assuming this to be true, it does not change Thompson's allegation of how the photo identification was carried out: Williamsport Police showed Cooper the "pixelated" photograph of the assailant, and asked if the photo depicted Cecil Thompson. While "[t]he suggestiveness of a photo array is determined by examining the totality of the circumstances,"[151] the ultimate inquiry is whether "the circumstances surrounding the array unduly suggest who an identifying witness should select."[152] That is why "single-suspect procedures have 'been widely condemned,'"[153] and carrying out a single-suspect procedure while mentioning the defendant's name is even worse.  The

---

[150] Doc. 42 at 2.

[151] *United States v. Ladson*, 238 F.App'x 874, 877 (3d Cir. 2007) (citing *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003)).

[152] *Lawrence*, 349 F.3d at 115.

[153] *Manson v. Braithwaite*, 432 U.S. 98, 133 (1977) (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1976)).

picture's blurriness removes any doubt as to whether the identification was reliable; officers cannot reliably identify suspects by using a Rorschach Test. Even without Cooper's subsequent voicemail, Thompson's factual allegations show that Cooper's identification carries no weight in the probable cause analysis.

But because there is no reason to doubt the credibility of Sierra and Clark, or the reliability of their identifications, Thompson has still failed to plead a lack of probable cause. The only argument Thompson makes to demonstrate unreliability is the conclusory statement that Sierra and Clark are "traumatized" victims. Courts routinely find that victim testimony is reliable; while trauma can undermine an eyewitness's reliability, it cannot be assumed to do so. Otherwise, probable cause could be disputed whenever a victim's identification was offered. And although it is more reasonable for officers to rely on eyewitness identifications where an actual identification procedure, such as a photo array, line-up or show-up, was conducted,[154] a victim's eyewitness identification is presumed to be reliable even where it is provided via a report to police instead of an identification procedure.[155]

Nor does Thompson persuasively allege that Sierra or Clark's identifications were unreliable. Five factors established in *Neil v. Biggers* are traditionally used to

---

[154] *See Vega v. Ripley*, No. 11-CV-2015, 2013 U.S. Dist. LEXIS 191975, at *16 (M.D. Pa. May 15, 2013) (Carlson, M.J.) (collecting cases stating that "police who rely upon a photo line-up identification of a suspect to make an arrest are entitled to qualified immunity from damages on a false arrest claim").

[155] *See, e.g.*, *Lynn v. Christner*, 184 F.App'x 180 (3d Cir. 2006) (unpublished) (where victim of a store robbery called police two months later to identify a customer as the masked robber, there was probable cause to arrest notwithstanding the fact that she was ultimately mistaken).

assess the reliability of eyewitness identification: the witness's opportunity to observe the suspect, the degree of attention during the initial observation, the accuracy of the initial description, the witness's degree of certainty when viewing the suspect at the confrontation, and the lapsed time between the crime and the identification.[156] Although the *Biggers* factors are designed to determine when eyewitness testimony is so unreliable that admitting it would violate due process, courts in this Circuit have used them as guideposts to determine whether eyewitness identification supports probable cause in a false arrest case.[157]

Only one of these factors actually undermines reliability here: the victims' opportunity to view the assailant was limited because he wore a surgical face mask during the attack. But Thompson does not even allege whether Clark had any opportunity to view the assailant's face, making it entirely possible, for example, that she may have seen his face if his mask slipped during the physical struggle.[158] Even drawing this inference in favor of Thompson, the fact that the perpetrator wore a mask obscuring half of his face is not enough to doubt the victims' identification. Although such identifications are often supported by other corroborating evidence,

---

[156] *Neil v. Biggers*, 409 U.S. 188, 199 (1972); *United States v. Brownlee*, 454 F.3d 131, 139 (3d Cir. 2006).

[157] *Morrison v. Schultz*, 270 F.App'x 111 (3d Cir. 2008); *Vazquez v. Rossnagle*, 163 F.Supp. 2d 494, 497-98 (E.D. Pa. 2001).

[158] *See United States v. Webb*, No. 09-755-1, 2010 U.S. Dist. LEXIS 125492, at *4-5 (E.D. Pa. Nov. 26, 2010), *aff'd*, 499 F.App'x 210 (3d Cir. 2010) (masked robber identified when his mask briefly slipped and victim saw his face).

such as a victim's distinctive voice or walk,[159] this is not necessarily required, especially where the victim had an opportunity to view the masked perpetrator at close range.[160] Courts in this Circuit have consistently treated victim identifications of masked perpetrators like any other, finding them sufficient to establish probable cause unless a reason is offered to cast doubt upon them. And since Thompson has pled no reason for Bolt to have doubted the credibility and reliability of Sierra and Clark's identifications, they establish probable cause as a matter of law unless outweighed by other exculpatory evidence.

In the similar false arrest case of *Lynn v. Christner*, our Court of Appeals found that summary judgment for the defendant police officer was appropriate in an unpublished opinion.[161] There, the robber of a Foodmart store had his face covered with a mask, and the victim saw him up close; the victim later identified the unmasked plaintiff "without doubt" when he came to Foodmart two months later.[162] Even though the security camera photos showed a robber with an unscarred forehead, and the victim identified a suspect with a scar on his forehead, this

---

[159] *See Tobal v. V.I. Police Dep't*, No. 2010-0062, 2022 U.S. Dist. LEXIS 6767, at *41 n.13 (D.V.I. Jan. 13, 2022) (collecting cases).

[160] *See id.*; *Scott v. Farrell*, No. 12-6049, 2013 U.S. Dist. LEXIS 174105, at *17 (E.D. Pa. Dec. 10, 2013) (Rueter, M.J.); *T.F.R. v. Morris Cnty Prosecutor's Office*, No. 2:16-5407, 2017 U.S. Dist. LEXIS 9307, at *3, *8 (D.N.J. Jan. 23, 2017) (hooded smoke shop robber whose face was partially obscured by bandana was identified by witness who stood five feet away from him); *Gov't of Virgin Islands v. Pereira*, 302 F.App'x 72, 76 (3d Cir. 2008); *Commonwealth v. Smith*, 423 A.2d 1296, 1299 (Pa. Super. Ct. 1981).

[161] 184 F.App'x 180 (3d Cir. 2006) (unpublished).

[162] *Id.* at 182, 184.

discrepancy was not enough to deprive the identification of probable cause.[163] The court noted that the robber had a similar height, build, hair, eyes, and voice to the appellant's.[164] Therefore, a false arrest action against the arresting officer was unavailable as a matter of law because the officer had no reason to doubt the initial identification. Here, although Sierra and Clark did not identify Thompson based on his eyes or voice, the countervailing facts are also far less persuasive.

In fact, what is left strengthens rather than weakens the probable cause suggested by Sierra and Clark's identifications. Thompson matched the suspect's general profile as corroborated by the photograph—he was a tall, thin, black male; and he passed the victims' home at least five times when they photographed him. Given that the initial assailant's true motives for attempting to take the victims hostage is still unknown, it was reasonable to assume that he might try to return to the scene of the crime. Although Thompson offered the ultimately truthful explanation that he was walking on High Street to go to and from his job, the Supreme Court of the United States has instructed that "[p]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."[165] Alongside this evidence, Thompson's exculpatory evidence—that officers did not find the assailant's clothing or firearm when executing a search warrant at Thompson's residence, that one Deputy believed the photographed suspect to look

---

[163] *Id.* at 184.
[164] *Id.*
[165] *District of Columbia v. Wesby*, 583 U.S. 48, 61 (2018).

younger than Thompson,[166] and that Thompson's clothing was distinct from the assailant's when he was stopped by officers—fails to outweigh the eyewitness identification.

The probable cause "determination is necessarily fact-intensive, and it will usually be appropriate for a jury to determine whether probable cause existed."[167] But when probable cause exists as a matter of law, there is no issue of fact mandating trial.[168] At the time of Thompson's arrest, Bolt had no reason to doubt the identifications provided by Sierra and Clark, and thus it is implausible that he lacked probable cause to arrest Thompson.

### 3.   State law assault, battery, and intentional infliction of emotional distress claims against Bolt

Thompson's assault and battery claims may be dismissed with little analysis. The tort of assault requires that the defendant act with the intent to place the plaintiff in apprehension of an imminent harmful or offensive bodily contact, and that the plaintiff actually experience such apprehension;[169] battery requires these elements, along with showing that such bodily contact actually occurred.[170] In support of his assault and battery claims against Bolt, Thompson alleges only that Bolt arrested

---

[166] *See Scuilli*, 853 F.3d at 702-703 ("[A]n estimate of age is inherently grounded in a subjective approximation that allows for reasonable margins of error.").

[167] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 468 (3d Cir. 2016).

[168] *See Christner*, 184 F.App'x at 184 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) ("Although the issue of probable cause is usually a factual one, a district court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding.")

[169] *Heverly v. Simcox*, No. 4:05-1370, 2006 WL 2927262, at *9 (M.D. Pa. Oct. 11, 2006).

[170] *Fulks ex rel. Daniel v. Gasper*, 439 F.Supp.2d 372, 379 (M.D. Pa. 2006).

him. Almost any arrest coincides with the elements for assault and battery, which is why police officers are privileged to commit these torts so long as they use a reasonable amount of force during the arrest.[171] Thompson has made no allegations regarding Bolt's conduct during his arrest itself, alleging only that the arrest took place. In the absence of any additional allegations this fact alone fails to state a claim for relief.

Intentional infliction of emotional distress requires a plaintiff to prove that the defendant "by extreme and outrageous conduct intentionally or recklessly cause[d] severe emotional distress."[172] But Thompson does not specify which act or acts by Thompson were outrageous. In any case, "[p]olice officers doing their job by arresting people when they have probable cause to do so certainly falls far short of extreme or outrageous conduct."[173] Knowingly instituting false charges may rise to outrageous conduct, [174] but no such allegation is plausible here and so it cannot support such a claim.

---

[171] *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633-34 (3d Cir. 1995).

[172] *Kazatkzy v. King David Memorial Park, Inc.*, 527 A.2d 988, 991 (Pa. 1981).

[173] *Cronmwell v. Fichter*, No. 22-3169, 2023 U.S. App. LEXIS 13357, at *4 (3d Cir. May 31, 2023) (quoting *Manley v. Fitzgerald*, 997 A.2d 1235, 1241 (Pa. Commwlth. Ct. 2010)).

[174] *See Kovalev v. City of Phila.*, No. 16-6380, 2017 U.S. Dist. LEXIS 27576, at *26-27 (E.D. Pa. Feb. 28, 2017); *Dempsey v. Bucknell Univ.*, No. 4:11-cv-1679, at *34-35, 2012 U.S. Dist. LEXIS 62043 (M.D. Pa. May 3, 2012).

### 4.     State law claims against Williamsport and Lycoming

As to the malicious prosecution claims against Williamsport and Lycoming County,[175] both are barred under the Political Subdivision Tort Claims Act ("PSTCA"). The PSTCA codifies the Commonwealth's sovereign immunity, providing that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property by any act of the local agency or an employee thereof or any other person."[176] The Act only provides for liability against local agencies based on nine enumerated bases for negligence liability.[177] None of those bases apply here. Additionally, that Section of the PSTCA explicitly does not cover "willful misconduct,"[178] which would necessarily include malicious prosecution.

42 Pa.C.S. § 8550 does provide for liability in certain circumstances where acts "constituted a crime, actual fraud, actual malice or willful misconduct," but that liability only extends to employees, not municipalities.[179] Admittedly, its language is confusing on this point. While the provision begins by stating that it applies to

---

[175] As stated earlier, that the prosecution was initiated with probable cause does not necessarily defeat a malicious prosecution action if the prosecution continued after probable cause dissipated. Liability could then be had based on acts after the initiation of the prosecution. But no such involvement by Bolt is alleged.

[176] 42 Pa.C.S. § 8451 (LEXIS 2022).

[177] 42 Pa.C.S. § 8542 (LEXIS 2022). These bases for liability are vehicle liability; care, custody or control of personal property; real property; trees, traffic controls and street lighting; utility service facilities; streets; sidewalks; care, custody or control of animals; and sexual abuse. 42 Pa.C.S. § 8542(b)(1)-(9).

[178] 42 Pa.C.S. § 8542(a)(2).

[179] 42 Pa.C.S. § 8550.

"any action against *a local agency* or employee," its stated effect is that certain subsections "shall not apply" in those actions.[180] But none of the specified subsections—8545 (official liability), 8546 (defense of official immunity), 8548 (indemnity), and 8549 (limitation on damages)—have anything to do with local agencies. Each pertains only to employees. So as most courts have held, [181] Section 8550 has no effect upon the "general rule" that "except as otherwise provided in" the PSTCA, "no provision of this title shall constitute a waiver of sovereign immunity."[182] This is consistent with the general interpretive rule that the PSTCA's waivers of sovereign immunity are to be "strictly construed and narrowly interpreted."[183] Accordingly, Thompson's state law claims must be dismissed with prejudice as to both Williamsport and Lycoming.

### 5.   Declaratory and Injunctive Relief

Defendant argues that any declaratory or injunctive relief is unavailable to Thompson.[184] Thompson agrees in his Brief in Opposition that this relief is

---

[180]   *Id.*

[181]   *Beard v. Borough of Duncansville*, 652 F.Supp. 2d 611 (W.D. Pa. 2009); *Zlomsowitch v. E. Penn. Twp.*, No. 3:11-CV-2131, 2012 U.S. Dist. LEXIS 62022, at *8-9 (M.D. Pa. May 3, 2012); *Williams v. City of Chester*, No. 14-4420, 2015 U.S. Dist. LEXIS 5401, at *5 & n.2 (E.D. Pa. Jan. 15, 2015)); *Dommel Props., LLC v. Jonestown Bank & Trust Co.*, No. 1:11-cv-2316, 2013 U.S. Dist. LEXIS 37343, at *36 (M.D. Pa. Mar. 19, 2013) ("Although § 8550 abrogates official immunity for intentional torts, that abrogation does not extend to municipalities").

[182]   42 Pa.C.S. § 8521(a).

[183]   *Weaver v. Franklin Cnty*, 918 A.2d 194, 200 (Pa. Cmwlth. 2007).

[184]   Doc. 42 at 22-23.

unavailable.[185] The Court therefore dismisses these claims without addressing their merits.

## III.    CONCLUSION

Defendants' motion to dismiss pursuant to Rule 12(b)(6) is granted.  As to Thompson's First and Eighth Amendment claims against Bolt and his malicious prosecution claim against Williamsport and Lycoming, leave to amend is denied. "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[186]  A complaint is "futile" if even, as amended, it would fail to state a claim upon which relief could be granted.[187] Although there is a "liberal pleading philosophy of the federal rules" no amendment will be permitted because another opportunity to plead a case would be futile.[188]

Thompson is granted leave to amend his other claims. The law in the Third Circuit is clear that leave to amend should be "freely given" regardless of whether leave is specifically requested.[189]

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[185] Doc. 55 at 11.
[186] *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).
[187] *Id.*
[188] *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).
[189] *Id.* (quoting Fed. R. Civ. P. 15(a)).