IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CECIL THOMPSON,

          Plaintiff,

    v.

CITY OF WILLIAMSPORT, *et al.*,

          Defendants.

No. 4:22-CV-01159

(Chief Judge Brann)

## MEMORANDUM OPINION

### APRIL 23, 2024

## I.  BACKGROUND

In June 2023, Plaintiff Cecil Thompson filed a seven-count amended complaint against the City of Williamsport ("Williamsport"), Lycoming County ("Lycoming"), Jason P. Bolt, Sherry Clark, Dayna Sierra, Zaria Cooper, and Rose View SNF, LLC, doing business as Roseview Nursing and Rehabilitation Center ("Rose View").[1] Cooper and Rose View were subsequently dismissed from the suit.[2] In November 2023, this Court dismissed Thompson's claims against Williamsport, Bolt, and Lycoming but granted Thompson leave to amend his complaint.[3] Thompson filed a second amended complaint in December 2023.[4] In December 2023, Lycoming filed a motion to dismiss pursuant to Federal Rule of

---

[1] Amended Complaint, Doc. 37.
[2] Order, Doc. 59.
[3] Order, Doc. 61.
[4] Second Amended Complaint, Doc. 62.

Civil Procedure 12(b)(6) for failure to state a claim.[5] Williamsport and Bolt also filed a motion to dismiss.[6] The motions are now ripe for disposition.

## A.   Motion to Dismiss Standard

Under Federal Rule of Civil Procedure 12(b)(6), courts dismiss a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[7] and *Ashcroft v. Iqbal*,[8] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[9] The United States Court of Appeals for the Third Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[10]

---

[5]   Lycoming County's Motion to Dismiss, Doc. 63.
[6]   City of Williamsport and Jason P. Bolt's Motion to Dismiss, Doc. 64.
[7]   550 U.S. 544 (2007).
[8]   556 U.S. 662 (2009).
[9]   *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).
[10]   *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

### B.    Facts Alleged in the Second Amended Complaint

### 1.    The incident

On May 18, 2020, Dayna Sierra and her mother Sherry Clark returned to their shared double home after running errands.[11] While unloading groceries, Sierra alerted Clark that she noticed a tall, thin black male watching them from behind a tree in an alleyway (the "perpetrator").[12] The perpetrator was wearing a light blue surgical mask and a gray hoodie with black stripes.[13] While Sierra was next door, Clark was inside her home putting groceries away.[14] The perpetrator knocked on Clark's back door while she was upstairs.[15] Clark's ten-year-old granddaughter Jada answered, and the perpetrator asked: "Is Lisa home?"[16] When Clark's grandson Christian Rivera came to the door, the perpetrator asked him the same question.[17] Rivera informed the perpetrator that no one named Lisa lived there.[18]

The perpetrator then brandished a gun from his waistband and held it against Rivera, stating that he would shoot Rivera and his two sisters if they did not "get on the ground and be quiet."[19] He led the children upstairs to the bedroom, where

---

[11]   Second Amended Complaint, Doc. 62 ¶11.
[12]   *Id.* ¶¶11-12.
[13]   *Id.* ¶11.
[14]   *Id.* ¶13.
[15]   *Id.*
[16]   *Id.* ¶14.
[17]   *Id.* ¶15.
[18]   *Id.*
[19]   *Id.* ¶16.

Clark was, and pointed the gun at Clark's head.[20] He again stated that he would kill Clark and her grandchildren unless they sat down and remained quiet.[21]

Clark feigned sitting on her bed, reached for a hidden "flashlight/billy club," and struck the perpetrator's arm.[22] She began repeatedly striking his body, beginning a physical struggle which continued as the pair moved to the hallway.[23] The perpetrator began stepping on Clark's legs and feet after knocking her to the floor, telling her to stop striking him.[24] Clark regained her footing and chased the assailant down the stairs, where he left his handprint on a picture frame.[25] The struggle continued in Clark's kitchen, until Clark pushed the perpetrator out of her back door.[26] Clark called the police immediately.[27]

Meanwhile, Cecil Thompson was having a less eventful evening playing Xbox at his home.[28]

### 2.   The investigation

Sierra and Clark, and their families gave statements to police officers that same day.[29] In the aftermath of the incident, Williamsport police officers extracted photographs of the assailant from a surveillance camera outside of the victims'

---

[20]  *Id.*
[21]  *Id.*
[22]  *Id.* ¶17.
[23]  *Id.* ¶¶17-18.
[24]  *Id.*
[25]  *Id.* ¶18.
[26]  *Id.*
[27]  *Id.* ¶19.
[28]  *Id.* ¶73.
[29]  *Id.* ¶19

residence and distributed those images to officers.[30] On May 21, 2020, two days after the incident, Deputies Warden, Whipple and Heath of the Lycoming County Sheriff's Department were driving near Sierra and Clark's double home when they observed Thompson walking along the street.[31] Thompson was wearing a black hooded sweatshirt with gray stripes, and like the perpetrator, is a tall, thin, black male.[32] As Deputy Warden believed that Thompson matched the perpetrator's general profile, he contacted officers at the Williamsport Police Department.[33] Warden received one of the extracted security camera photographs of the perpetrator via text message.[34]

After the deputies stopped Thompson and asked for his identification, Thompson explained that he was walking home from his shift at Rose View, a nearby nursing home; he was released from the stop without arrest.[35] After the stop, Warden wrote in his incident report that Thompson appeared younger than the perpetrator, and wore distinct clothing.[36] He also wrote that "the photos [he] received are somewhat pixelated and it was hard to see any distinct facial features other than black glasses."[37] Over the subsequent two months, between May 21, 2020 and July 28, 2020, Clark, Sierra, and other members of their households saw

---

[30] *Id.* ¶20.
[31] *Id.* ¶22.
[32] *Id.* ¶23.
[33] *Id.* ¶¶23-24.
[34] *Id.* ¶24.
[35] *Id.* ¶33.
[36] *Id.* ¶¶29-30.
[37] *Id.* ¶24; *id.* at 6.

Thompson passing their homes and believed that he was the perpetrator. They sent law enforcement officers at least five photographs of Thompson.[38]

On June 25, 2020, Bolt and other Williamsport officers "raided" Rose View "with rifles and/or other weapons drawn."[39] The officers approached Human Resources employee Zaria Cooper, "specifically said they were looking for Plaintiff Cecil Thompson," and asked if the photograph of the perpetrator depicted him.[40] Cooper agreed that Thompson was shown in the photograph.[41]

### 3.    The arrest and prosecution

On July 28, 2020, Bolt filed an affidavit of probable cause to arrest Thompson.[42] Thompson contests the affidavit's truthfulness[43] and alleges that "Bolt simply inserted the Plaintiff's name as "THOMPSON" in boilerplate fashion in the Affidavit . . . without ascertaining any corroborating evidence from Defendants Clark and Sierra," "simply based upon the multiple photographs and/or videos sent to him" of Thompson walking past Sierra and Clark's double-home.[44] The affidavit reads as follows:

> On Monday, May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home

---

[38]  *Id.* ¶38.

[39]  *Id.* ¶¶38, 81 ("They came in with, with um rifles and they were looking for, for him because of the crime that he um committed. And all I did was point out the employee that they were looking, looking for.").

[40]  *Id.*

[41]  *Id.*

[42]  *Id.* ¶44.

[43]  *Id.* ¶88.

[44]  *Id.* ¶¶ 48-50.

invasion/robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with the victim SHERRY CLARK, who stated that a B/M [later identified as CECIL THOMPSON, D.O.B. [redacted]] had knocked on the rear door and asked her 10-year- old granddaughter to see "Lisa." When the juveniles replied that no one by that name lived there and began to close the door, THOMPSON forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles [a 9-yr old female, 10-yr old female and 15-yr old male] and told them to "get on the ground and be quiet" or he would shoot them. After asking about the other occupants in the residence, THOMPSON then paraded the trio of juveniles to a second-floor bedroom where CLARK was. THOMPSON then pointed the firearm at CLARK before telling her and the juveniles to all "be quiet and sit down" inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at THOMPSON, which then began a brief altercation in which THOMPSON struck CLARK in the head, knocking her to the floor. THOMPSON continuously told CLARK that he would shoot her, however CLARK continued to strike THOMPSON in the legs. THOMPSON eventually ran from the bedroom and fled out of the residence.

While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing the recordings THOMPSON could be observed in a grey/black hooded sweatshirt, blue jeans and white sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. THOMPSON is observed to stop and watch CLARK and another adult female carrying groceries into house, after which he raises his mask onto his face and approaches the residence.

On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed THOMPSON walking past the residence in work clothing and immediately recognized him. A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as THOMPSON.

Based on this information I request that a warrant be issued for THOMPSON and that he be brought before the courts to answer for these charges.[45]

On July 29, 2020, Bolt and other Williamsport officers arrested Thompson during his workday at Rose View.[46] Thompson then consented to a buccal swab, which was sent for comparison with the crime scene DNA.[47] Meanwhile, Thompson was charged with five felonies and eleven misdemeanors by the Lycoming County District Attorney's Office.[48]

A preliminary hearing was held on August 4, 2020.[49] Every testifying witness who saw the perpetrator agreed that he had a unique, distinctive forehead.[50] Bolt agreed based on his review of security footage.[51] Clark's testimony also showed that she had poor eyesight and that the perpetrator wore a face mask during the incident.[52] Sierra testified that she never saw the perpetrator during the crime.[53] Thompson remained in jail as he was unable to pay the $750,000 bail.[54]

---

[45]   Affidavit of Probable Cause, Doc. 62-3 at 7-8.
[46]   Second Amended Complaint, Doc. 62 ¶53-54.
[47]   *Id.* ¶55.
[48]   *Id.* ¶54.
[49]   *Id.* ¶¶58-62.
[50]   Preliminary Hearing Transcript, Doc. 62-5 at 27:14–28:13 (Clark); 48:17–49:9 (Sierra); 76:14–77:9 (Rivera).
[51]   Second Amended Complaint, Doc. 62 ¶62; Preliminary Hearing Transcript, Doc.62-5 at 91-92.
[52]   *Id.* ¶58; Preliminary Hearing Transcript, Doc. 62-5 at 19, 25, 27-28.
[53]   Second Amended Complaint, Doc. 62 ¶59; Preliminary Hearing Transcript, Doc. 62-5 at 42-44, 48-49.
[54]   Second Amended Complaint, Doc. 62 ¶63.

On September 29, 2020, two fingerprint examiners concluded that Thompson's fingerprints did not match those taken from the picture frame and flashlight/billy club.[55] Although this analysis was sent to Bolt that same day,[56] Thompson was not informed about the results until it was disclosed on November 20, 2022.[57] Upon this disclosure, Thompson's public defender sought to reduce his bail to $25,000.[58] Thompson paid the reduced bail and was released from imprisonment.[59] In total, Thompson was imprisoned for approximately four months.[60]

Because Thompson's prosecution continued, his counsel sent a letter titled "Notice of Claim and Intent to Sue" to the Defendants in this case on December 3, 2020, stating that Thompson intended to pursue a civil action against them.[61] After the letter, even more exonerating evidence was produced. An affidavit obtained from a Microsoft employee on December 27, 2020, confirmed that Thompson was playing Xbox during the time of the crime.[62] And on February 23, 2021, the Pennsylvania State Police provided a DNA analysis confirming that Thompson's

---

[55]   *Id.* ¶¶64-65; Fingerprint Analysis Report, Doc. 62-6.
[56]   Second Amended Complaint, Doc. 62 ¶67; Fingerprint Analysis Report, Doc. 62-6 ("ATTN: Jason Bolt").
[57]   Second Amended Complaint, Doc. 62 ¶68.
[58]   *Id.* ¶70.
[59]   *Id.*
[60]   *Id.* ¶69.
[61]   *Id.* ¶72; Notice of Claim and Intent to Sue, Doc. 62-7.
[62]   Second Amended Complaint, Doc. 62 ¶73; Xbox Affidavit, Doc. 62-8.

DNA did not match the DNA retrieved from the crime scene.[63] Despite these developments, the District Attorneys continued to prosecute Thompson's case for two additional years, allegedly in retaliation for Thompson's Notice of Claim letter.[64] Thompson contends that personnel from the District Attorney's Office offered to withdraw his criminal charges if Thompson agreed to dismiss this civil lawsuit.[65]

This Court stayed Thompson's civil proceedings while his prosecution was pending.[66] In September 2022, Thompson's criminal case was nol prossed by Order of the Court of Common Pleas of Lycoming County.[67] Thompson then filed a Status Report in March 2023, informing this Court that his prosecution had concluded.[68] In April 2023, after this Court lifted the stay,[69] Zaria Cooper telephoned Bonnie Schriner, who is employed by Schriner Process Service and Investigations.[70] Cooper stated that "police officers" had repeatedly come to her home and told her not to testify in this civil lawsuit.[71] Thompson also alleges that Williamsport and Lycoming provided no training or supervision to their police

---

[63]   Second Amended Complaint, Doc. 62 ¶75; DNA Analysis Report, Doc. 62-4.
[64]   Second Amended Complaint, Doc. 62 ¶76.
[65]   *Id.* ¶86.
[66]   Motion to Stay, Doc. 4.
[67]   Second Amended Complaint, Doc. 62 ¶79.
[68]   Status Report, Doc. 6.
[69]   Order, Doc. 7.
[70]   Second Amended Complaint, Doc. 62 ¶82.
[71]   *Id.*

officers and attorneys concerning the timely provision of *Brady* material and the necessity of providing truthful statements in affidavits of probable cause.[72]

Thompson now sues Bolt, Sierra, Clark, Williamsport, and Lycoming for witness intimidation under 42 U.S.C. § 1985(2), conspiracy to deprive him of civil rights under 42 U.S.C. § 1985(3), and various constitutional violations under 42 U.S.C. § 1983; he also brings state law claims of false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress against Bolt, Sierra and Clark.

## II.     ANALYSIS

### A.     Section 1985 Claims Against All Defendants

Thompson's second amended complaint pleads two civil rights conspiracy claims under Section 1985, both based upon the allegation that officers told Zaria Cooper not to testify in this civil case.[73]

The elements of a Section 1985(3) claim are "(1) a conspiracy of two or more persons; (2) motivated by racial or class-based discriminatory animus designed to deprive, directly or indirectly, any person or class of person to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an

---

[72]  *Id.* ¶¶95-99
[73]  Second Amended Complaint, Doc. 62 at 24-25.

injury to person or property or to the deprivation of any right or privilege of a citizen of the United States."[74]

A plaintiff asserting a § 1985(3) claim must allege "that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[75] Thompson makes no allegation of race-based animus, but argues that he "is clearly a member of a class – American citizens charged with a crime, who are entitled to the effectuated protections of the U.S. Constitution."[76] But Thompson has not cited, nor has the Court discovered, any authority suggesting that "American citizens charged with a crime" is a class covered by Section 1985(3). Nor do Thompson's pleadings suggest any animus towards "American citizens charged with a crime." So the 1985(3) claim is dismissed with prejudice.

"A Section 1985(2) witness intimidation claim required '(1) a conspiracy between two or more persons (2) to deter a witness by force, intimidation or threat from attending court or testifying freely in any pending matter, which (3) results in injury to the plaintiffs."[77] Unlike other Section 1985 claims, witness intimidation

---

[74] *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001).
[75] *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272-73 (1993).
[76] Brief in Opposition to Williamsport and Lycoming's Motion to Dismiss, Doc. 72 at 14.
[77] *Malley-Duff & Associates, Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 356 (3d Cir. 1986).

claims do not require allegations of racial or class-based discriminatory animus.[78] However, this claim is not yet ripe for review.

"Ripeness is a justiciability doctrine that derives from Article III of the United States Constitution . . . the doctrine is inextricably tied to Article III's requirement of a case or controversy."[79] "The function of ripeness doctrine is to determine whether a party has brought an action prematurely."[80] Ripeness involves a court's consideration of (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration."[81]

Section 1985(2) witness intimidation claims require an injury to the plaintiff's case; either the witness is deterred from testifying in court in the action, or the witness intimidation occurs at the pre-trial stage, causing some other cognizable injury.[82] There is no way to determine whether Thompson will actually suffer the injury of Cooper not testifying, or not assisting in discovery, until this suit runs its course. If Cooper cooperates and testifies despite the officers' actions, then Thompson suffers no injury and his 1985(2) claim fails. Accordingly, while

---

[78] *Kush v. Rutledge*, 460 U.S. 719 (1983).

[79] *Jie Fang v. Dir. United States Immigration & Customs Enforcement*, 935 F.3d 172, 185-86 (3d Cir. 2019).

[80] *Peachlum v. City of York*, 333 F.3d 429, 433 (3d Cir. 2003).

[81] *Abbott Labs. v. Gardner*, 387 U.S. 136,148-49 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105 (1977); *Peachlum*, 333 F.3d at 433-34 (setting out considerations underpinning ripeness analysis).

[82] *Malley-Duff*, 792 F.2d 341, 355-56 (3d Cir. 1986), *aff'd* 483 U.S. 143 (1987) (explaining that witness intimidation at pretrial stage can impact her willingness or ability to provide discovery and thereby affect the outcome of a case).

this claim is dismissed without prejudice, the Court declines to grant Thompson

leave to amend his complaint to replead it in this suit.

### B.    Section 1983 Claims Against Bolt

Title 42 U.S.C. § 1983 provides a cause of action for violations of the United

States Constitution under color of state law.[83] Thompson now alleges that Bolt has

violated his Fourth, Fifth, and Fourteenth Amendment rights.

#### 1.    Fifth Amendment Claim

Thompson pleads a Fifth Amendment claim, but it is unclear what theory he

is alleging. He refers to the Fifth Amendment claim as relating to "criminal due

process" and his Fourteenth Amendment claim as relating to "due process."[84] As

the Fourteenth Amendment incorporated the Fifth Amendment's due process rights

against the states[85] and Thompson only provides arguments relating to an alleged

*Brady* violation, I construe these claims together and analyze whether Thompson

has plausibly alleged a Section 1983 claim based on a *Brady* violation under the

Fourteenth Amendment.

#### 2.    Fourteenth Amendment *Brady* Claim

In *Brady v. Maryland*, the Supreme Court of the United States held that "the

suppression by the prosecution of evidence favorable to an accused upon request

---

[83]    *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).
[84]    Brief in Opposition to Williamsport and Bolt's Motion to Dismiss, Doc. 72 at 7.
[85]    *See Tarapchak v. Lackawanna Cnty*, 173 F.Supp. 3d 57, 78 (M.D. Pa. 2016) ("[T]hese Defendants are state actors and the Fifth Amendment does not restrict their actions as it only limits federal government action.").

violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of prosecution."[86] The Government has an affirmative duty to disclose exculpatory evidence if suppressing it would be "of sufficient significance to result in the denial of the defendant's right to a fair trial."[87] "Police officers and other state actors may be liable under § 1983 for failing to disclose exculpatory information to the prosecutor."[88] "There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently; and [(3)] prejudice must have ensued."[89]

Thompson alleges that "Defendant Bolt and/or Defendant City's police department and/or Defendant Lycoming County's district attorney office failed to provide the exculpatory Brady and/or Giglio evidence" for two months.[90] He also alleges that Bolt received the exonerating fingerprint analysis on September 29, 2020.[91] It is plausible that the fingerprint evidence is exculpatory, that Bolt

---

[86] 373 U.S. 83, 87 (1963).
[87] *United States v. Agurs*, 427 U.S. 97, 108 (1976).
[88] *Gibson v. Superintendent of New Jersey Dep't of Law & Public Safety-Division of State Police*, 411 F.3d 427, 443 (3d Cir. 2005).
[89] *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).
[90] Second Amended Complaint, Doc. 62 ¶71.
[91] *Id.* ¶68; Fingerprint Analysis Report, Doc. 62-6.

willfully or inadvertently failed to disclose it for two months,[92] and that this caused the alleged injury of an extended term of imprisonment.

But an increased term of imprisonment due to a delayed bail reduction is not the kind of prejudice contemplated under *Brady*, so Thompson's claim is unavailable as a matter of law. "The obligation to disclose such 'Brady material' is 'not based on any general constitutional right to discovery in criminal cases, but rather on a defendant's due process right to a fair trial.'"[93] "To constitute a Brady violation, the nondisclosure must do more than impede the defendant's ability to prepare for trial; it must adversely affect the court's ability to reach a just conclusion, to the prejudice of the defendant."[94] "No denial of due process occurs if Brady material is disclosed to [defendant] in time for its effective use at trial."[95]

Thompson's case was never tried because his prosecution was nol prossed.[96] And because he did receive the fingerprint evidence, Thompson would have been able to use it if a trial had been held.[97] This Court is skeptical that *Brady* protects a

---

[92]   Thompson does not directly allege that Bolt failed to disclose this evidence to the prosecutor, but this fact can plausibly be construed in Thompson's favor based upon the facts in the second amended complaint.

[93]   *United States v. Bashir*, 738 F.App'x 743, 748 (3d Cir. 2018) (unpublished) (quoting *United States v. Higgs*, 713 F.2d 39, 42 (3d Cir. 1983)); *see also Strickler*, 527 U.S. at 290 (1999) (quoting *Kyles*, 514 U.S. at 435) ("[T]he question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the *verdict*.") (emphasis added).

[94]   *United States v. Starusko*, 729 F.2d 256, 262 (3d Cir. 1984).

[95]   *Higgs*, 713 F.2d at 44.

[96]   *See* Second Amended Complaint, Doc. 62 ¶79.

[97]   *See Bashir*, 738 F.App'x at 749 ("[W]hether a defendant's due process rights are violated . . . depends on whether the information is material and has been disclosed in time for the defendant to effectively use it.").

criminal defendant's due process rights at a bail hearing. Even if it did, the fingerprint evidence was only available to Bolt after the initial bail hearing. And, the eventual disclosure of this evidence allowed Thompson to effectively use it to secure a bail reduction at the subsequent hearing. Because Thompson suffered no prejudice to his right to a fair trial, or even a fair bail hearing, Thompson's Fifth and Fourteenth Amendment claims are dismissed with prejudice.

### 3. Federal and State Law False Arrest, False Imprisonment, and Malicious Prosecution Claims

Thompson's Section 1983 Fourth Amendment claims against Bolt are based on theories of false arrest, false imprisonment, and malicious prosecution; he also brings equivalent claims under Pennsylvania state law. As this Court stated previously, "[e]ach of these constitutional torts shares the core element that probable cause must be lacking."[98] And as before, probable cause is the only element of these torts disputed by the parties.

Thompson's Federal claims also require him to rebut Bolt's qualified immunity defense. "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at

---

[98] Memorandum Opinion, Doc. 60 at 14. False arrest and false imprisonment are generally interchangeable, requiring that the plaintiff was arrested or imprisoned without probable cause. *Harvard v. Cesnalis*, 973 F.3d 190, 199 (3d Cir. 2020); *Wallace v. Kato*, 549 U.S. 384, 389 (2007). *See also Cesnalis*, 973 F.3d at 206 (quoting *Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003) (setting out five elements to malicious prosecution claims).

the time of the challenged conduct."[99] "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."[100]

Because Bolt's affidavit was approved by a neutral magistrate and it is not obviously deficient, qualified immunity would ordinarily bar his Federal claims.[101] The exception to this bar applies where the officer (1) "knowingly and deliberately, or with a reckless disregard for the truth, made false statements and omissions that create a falsehood in applying for a warrant," and (2) "such statements or omissions are material, or necessary, to the finding of probable cause."[102] Under such circumstances, "the protection afforded by the magistrate's review [of the affidavit] is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are."[103] The Court conducts a "three-step procedure . . . First, we assess the evidence the plaintiff asserts was recklessly omitted from the affidavit. Next, we reconstruct an affidavit that includes any recklessly omitted information. And finally, we assess the materiality of the omitted information to the probable cause determination."[104]

[99] *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).
[100] *Id.* at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) (cleaned up).
[101] *See* Memorandum Opinion, Doc. 60 at 15; *Messerchmidt v. Millender*, 565 U.S. 535, 546-57 (2012).
[102] *Wilson*, 212 F.3d at 786-87 (citing *Sherwood v. Mulvill*, 113 F.3d 396, 399 (3d Cir. 1997)).
[103] *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 469 (3d Cir. 2016).
[104] *Id.* at 470.

The same analysis controls with respect to Thompson's Pennsylvania state law claims for false arrest, false imprisonment, and malicious prosecution.[105]

Thompson's principal argument is that Bolt was "deliberately indifferent to the trifecta of exonerating, exculpatory Brady/Giglio evidence about the Plaintiff,"[106] but as this evidence was induced after Bolt wrote his affidavit of probable cause, failing to include it in the affidavit is neither misrepresentation nor omission. Just because Bolt could have discovered this exonerating information more speedily does not mean that he intentionally or recklessly omitted it.[107] A court does "not evaluate probable cause in hindsight."[108]

That renders Thompson's later-discovered "trifecta" of exonerating evidence relevant only under the theory that it induced probable cause to dissipate after an initially lawful arrest. Some in-Circuit authority has suggested this theory's viability.[109] But four days after this Court's prior opinion, the Third Circuit

---

[105] *See Rusoli v. Salisbury Twp.*, 126 F.Supp. 821, 869 (E.D. Pa. 2000) (citing *Patzig v. O'Neil*, 577 F.2d 841, 851 (3d Cir. 1978)) ("Pennsylvania state law false arrest claims and federal constitutional false arrest claims are co-extensive both as to elements of proof and elements of damages."); *Commonwealth v. Taylor*, 850 A.2d 684, 688-89 (Pa. Super. Ct. 2004) (Superior Court "adopt[ing] as [its] own the circuit court's reasoning regarding omissions" in an affidavit of probable cause in *Wilson v. Russo*).

[106] Brief in Opposition to Williamsport and Bolt's Motion to Dismiss, Doc. 72 at 10-11.

[107] *See Baker v. McCollan*, 443 U.S. 137, 145-45 (1979) (quoting *Patterson v. New York*, 432 U.S. 197, 208 (1977)) ("Due process does not require that every conceivable step be taken, at whatever cost, to eliminate the possibility of convicting an innocent person.").

[108] *Florida v. Harris*, 568 U.S. 237, 249 (2013).

[109] *See* Memorandum Opinion, Doc. 60 at 18 (citing *Kelly v. Jones*, 148 F.Supp. 395 (E.D. Pa. Apr. 17, 2015) ("*Kelly I*") (motion to dismiss denied where a prosecuting officer's failure to investigate caused unconstitutionally prolonged period of imprisonment despite initially lawful arrest pursuant to valid warrant) *order vacated*, No. 14-cv-4317, 2015 U.S. Dist. LEXIS 116433 (E.D. Pa. May 13, 2015), *order reinstated*, 148 F.Supp. 3d 406 (E.D. Pa.

considered the argument that "officers, following a valid arrest, [were obligated] to respond in some way to new information that dissipated the probable cause justifying that arrest" in an unpublished opinion.[110] The Third Circuit noted that it has twice punted on this "difficult question" and determined that such violations were not "clearly established" during the 2019-2021 period in which the relevant conduct occurred.[111] While unpublished decisions of the Court of Appeals are not binding on this Court, they do carry persuasive authority.[112] Consequently, I defer to the Third Circuit's recent qualified immunity determination in *Rivera*, and reject any Fourth Amendment argument premised upon later-discovered evidence.

A host of other evidence is absent from Bolt's affidavit, but Thompson does not always explicitly allege Bolt's knowledge, or reckless disregard towards the truth, of this evidence when authoring the affidavit. Nevertheless, it can be inferred that Bolt intentionally or recklessly omitted three key facts at the time of the arrest.

First, Bolt was present during Zaria Cooper's identification and therefore aware of the suggestive procedure used. Officers confronted Cooper with "rifles drawn," showed her the pixelated image of the perpetrator, and asked if it depicted

---

Nov. 24, 2015) ("*Kelly II*") (thoroughly analyzing the defendant's qualified immunity defense and finding this violation to be clearly established)).

[110] *Rivera v. Dir. Ronald P. Edwards*, No. 23-1286, 2023 U.S. App. LEXIS 30942, at *9 (3d Cir. Nov. 21, 2023).

[111] *Id.*

[112] *See Maracco v. Kuder*, No. 08-713 (NLH), 2009 U.S. Dist. LEXIS 6757, at *8 (D.N.J. Jan. 30, 2009) (explaining that unpublished opinions of the Third Circuit are not precedential but carry "considerable persuasive authority.").

Thompson.[113] In contrast, Bolt's affidavit states that "[a] photo of the suspect was later shown to his employer [Cooper], who identified the individual that entered the residence as Thompson."[114] This omits the photograph's poor quality and the fact that Thompson was suggested to Cooper before she identified him.

Second, Bolt states that he reviewed the surveillance footage of the perpetrator.[115] Bolt was therefore aware that the footage was of poor quality and did not clearly depict the perpetrator's face.[116] By averring that "[i]n reviewing the recordings Thompson could be observed," and by inserting Thompson's name into his description of the crime, Bolt misrepresents the footage's quality and omits the uncertainty clouding this review of the photographs and recordings.[117]

Third, at the preliminary hearing conducted after Thompson's arrest, every testifying witness who saw the perpetrator in person—Clark,[118] Sierra,[119] and

---

[113] Second Amended Complaint, Doc. 62 ¶40.

[114] Affidavit of Probable Cause, Doc. 62-3 at 9.

[115] *Id.* at 7. Bolt also described his review of this footage at the subsequent preliminary hearing. Preliminary Hearing Transcript, Doc. 62-5 at 80-83.

[116] Second Amended Complaint, Doc. 62 ¶¶24-30, 40. The quality of these photographs and videos is a factual issue construed in Thompson's favor. *See also* Deputy Warden Incident Report, Doc. 62-2.

[117] Affidavit of Probable Cause, Doc. 62-3 at 7; Second Amended Complaint, Doc. 62 ¶¶48-49.

[118] Preliminary Hearing Transcript, Doc. 62-5 at 27:14–28:13 ("He had a weird forehead . . . . He has two like bumps on each side of his forehead on the top . . . it goes straight up and then there's a bump here, and there's like a little separation in between . . . I think he was born that way.").

[119] *Id.* at 48:17–49:9 (The perpetrator "had an off forehead. His forehead was odd to me. There was more of distinct physical features than most people's foreheads . . . he seemed to have sort of a bump or kind of ridged his forehead.").

Christian Rivera[120]—testified that the perpetrator's forehead was distinctive. Bolt's subsequent testimony also shows his awareness of this fact. He testified that based on his review of the surveillance footage, the perpetrator's forehead was "prominent," "noticeable," and "unique," concluding that "it would be very helpful to identify someone with that forehead, that is correct, that it would be memorable, which is why everyone seems to remember it."[121] It is therefore plausible both that the perpetrator's forehead was so unique that it was observed by and known to Bolt, and so unique as to be materially exculpatory.

Finally, Sierra and Clark's photographic identifications of Thompson while he passed their homes are never mentioned in Bolt's affidavit; Bolt only states that "Clark's family" observed Thompson passing by and "immediately recognized him."[122] While other Circuits have instructed courts to examine missing inculpatory information when reconstructing affidavits,[123] the Third Circuit's instruction in *Dempsey v. Bucknell University* was more limited:

> In the normal course, the next step of our analysis would be to reconstruct the affidavit, including the recklessly omitted [exculpatory] information, so that we may proceed with a materiality analysis. In some cases, however, there will be other information in the record that gives context to or affects the weight to be accorded

---

[120]  *Id.* at 76:14–77:9 (Testifying that it was unique how the perpetrator's "forehead had been shaped," and that it "didn't seem like . . . something that you'd normally see . . . it was like shaped like a little weird by how it was, but then also he had . . . a line going across").

[121]  *Id.* at 91:9–92:7.

[122]  Affidavit of Probable Cause, Doc. 62-3 at 7.

[123]  *Escalera v. Lunn*, 361 F.3d 737, 744 (2d Cir. 2004); *Ganek v. Leibowitz*, 874 F.3d 73, 85 n.6 (2d Cir. 2017); *Loftin v. City of Prentiss*, 33 F.4th 774, 782 (5th Cir. 2022); *see also Butler v. Smith*, 85 F.4th 1102, 1120-21 (11th Cir. 2023) (Carnes, J., Concurring).

the recklessly omitted information, such that it also should be considered by the reviewing court in determining materiality.[124]

While the parties provide briefing on the reliability of Sierra and Clark's photographic identifications of Thompson, the identifications are unrelated to Cooper's identification, the surveillance footage's quality, or the perpetrator's distinctive forehead. So because this inculpatory evidence does not provide context to or affect the weight of recklessly omitted information, it is not inserted into the reconstructed affidavit.

In sum, it is plausible from the second amended complaint that Bolt intentionally or recklessly misrepresented the nature of Cooper's identification, misrepresented the surveillance footage's quality, and omitted the discrepancy between the perpetrator's forehead and Thompson's. Each of these omissions is "a fact in [Bolt's] ken that 'any reasonable person would have known that . . . a judge would wish to know.'"[125] So the Court must next "perform a word-by-word reconstruction of the affidavit."[126] And if it is plausible that Bolt lacked probable cause when considering this reconstructed affidavit, Thompson's claim survives dismissal.[127]

---

[124] *Dempsey*, 834 F.3d at 474 (citing *United States v. Frost*, 999 F.2d 737 (3d Cir. 1993)) (emphasis added); *see also St. Clair v. Harris*, No. 21-1837, 2023 U.S. Dist. LEXIS 108153, at *22 (W.D. Pa. June 20, 2023) (Lenihan, M.J.).

[125] *Wilson*, 212 F.3d at 787 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).

[126] *Dempsey*, 834 F.3d at 470.

[127] In an unpublished opinion, the Third Circuit cast doubt upon performing this analysis at the motion to dismiss stage. *Noviho v. Lancaster Cnty. of Pa.*, 683 F.App'x 160, 164 (3d Cir.

The reconstructed affidavit reads as follows:[128]

On Monday, May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home invasion/robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with the victim SHERRY CLARK, who stated that a B/M [later identified as CECIL THOMPSON, D.O.B. [redacted]] had knocked on the rear door and asked her 10-year- old granddaughter to see "Lisa." When the juveniles replied that no one by that name lived there and began to close the door, ~~THOMPSON~~ **[the perpetrator]** forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles [a 9-yr old female, 10-yr old female and 15-yr old male] and told them to "get on the ground and be quiet" or he would shoot them. After asking about the other occupants in the residence, ~~THOMPSON~~ **[the perpetrator]** then paraded the trio of juveniles to a second-floor bedroom where CLARK was. ~~THOMPSON~~ **[The perpetrator]** then pointed the firearm at CLARK before telling her and the juveniles to all "be quiet and sit down" inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at ~~THOMPSON~~ **[the perpetrator]**, which then began a brief altercation in which ~~THOMPSON~~ **[the perpetrator]** struck CLARK in the head, knocking her to the floor. ~~THOMPSON~~ **[The perpetrator]** continuously told CLARK that he would shoot her, however CLARK continued to strike ~~THOMPSON~~ **[the perpetrator]** in the legs. ~~THOMPSON~~ **[The perpetrator]** eventually ran from the bedroom and fled out of the residence.

While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing the recordings ~~THOMPSON~~ **[the perpetrator]** could be observed in a grey/black hooded sweatshirt, blue jeans and white

---

2017). The *Noviho* court did not overturn a district court which failed to reconstruct the affidavit at dismissal and noted that "our cases directing the District Court to reconstitute the probable cause affidavit generally arise on summary judgment, not dismissal." *Id.* But in the March 12, 2024 case of *Pinkney v. Meadville*, the Third Circuit *did* explain how it would reconstruct the affidavit, and conduct this part of the analysis, when affirming the district court's denial of a motion to dismiss. No. 23-1095, 95 F.4th 743, 2024 U.S. App. LEXIS 5853, at *8-9 (3d Cir. Mar. 12, 2024) (Bibas, J.). This Court defers to the approach taken by the Third Circuit's more recent, and published, opinion.

[128] Insertions are bolded and bracketed. Deletions are marked with a strikethrough.

sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. ~~THOMPSON~~ **[The perpetrator]** is observed to stop and watch CLARK and another adult female carrying groceries into house, after which he raises his mask onto his face and approaches the residence. [**The video footage was too pixelated and grainy to clearly discern the perpetrator's face. And in much of the footage, the perpetrator's head was covered by his hood, and his face was covered by a surgical face mask, so that only the upper half of his face was visible. However, your affiant did observe, based on some of the video footage, that the perpetrator had a unique and prominent forehead.**]

On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed ~~THOMPSON~~ **[the perpetrator]** walking past the residence in work clothing and immediately recognized him. ~~A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as CECIL THOMPSON.~~ [**On June 25, 2020, your affiant, alongside other officers, raided Rose View nursing home, CECIL THOMPSON's place of employment. With rifles drawn, officers showed THOMPSON's employer the pixelated photograph of the perpetrator and asked whether it depicted CECIL THOMPSON. She stated that the photograph did depict THOMPSON. However, THOMPSON lacked the unique and prominent forehead your affiant observed in the surveillance footage of the perpetrator.**]

Based on this information I request that a warrant be issued for THOMPSON and that he be brought before the courts to answer for these charges.

Based on this reconstructed affidavit, it is plausible that Bolt lacked probable cause to arrest Thompson.

Probable cause is a "totality of the circumstances" analysis.[129] "Probable cause exists if, at the moment the arrest was made, 'the facts and circumstances

---

[129] *Maryland v. Pringle*, 540 U.S. 366, 371 (2003).

within the arresting officers' knowledge . . . were sufficient to warrant a prudent man in believing that [suspect] had committed or was committing an offense.'"[130] Evidence supporting probable cause need not be as strong as would be needed to support a conviction, and the officer need not make his determination based upon "the fine resolution of conflicting evidence required at trial,"[131] but there must at least be a "'fair probability' that a person committed the relevant crime."[132]

"[I]t is 'well-established' that 'probable cause may be based on a single and reasonably reliable witness eyewitness identification.'"[133] But "[a] single witness identification, without more, must have at least basic signs of reliability to amount to probable cause."[134] For the same reasons this Court stated in its prior Opinion, Cooper's identification is "entirely void in the probable cause analysis."[135] Cooper's identification is so suggestive that it cannot be considered reliable because officers simply presented her one photograph and suggested Thompson's name to her.[136]

---

[130] *Southerland v. Commonwealth*, 389 F.App'x 166, 168 (3d Cir. 2010) (quoting *Snell v. City of York*, 564 F.3d 659, 671 (3d Cir. 2009)) (cleaned up).

[131] *United States v. Navedo*, 694 F.3d 463, 467 (3d Cir. 2012) (cleaned up).

[132] *Wright v. City of Phila.*, 409 F.3d 595, 602 (3d Cir. 2005).

[133] *Johnson v. City of Phila.*, No. 13-6616, 2015 U.S. Dist. LEXIS 60458, at *11-12 (E.D. Pa. May 8, 2015) (quoting *Greene v. City of Phila.*, No. 97-4262, 1998 U.S. Dist. LEXIS 6954, at *20-21 (E.D. Pa. May 8, 1998)); *see also Wilson*, 212 F.3d at 794 (citing *Greene*).

[134] *Pinkney*, 2024 U.S. App. LEXIS 5853, at *9-10.

[135] Memorandum Opinion, Doc. 60 at 27.

[136] *See id.* at 27-28 (setting out reasoning based on same allegations of fact); *United States v. Ladson*, 238 F.App'x 874, 877 (3d Cir. 2007) ("The suggestiveness of a photo array is determined by examining the totality of the circumstances.") (citing *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003)); *Lawrence*, 349 F.3d at 115 (The ultimate inquiry is whether "the circumstances surrounding the array unduly suggest who an

The reconstructed affidavit also states that Bolt "was contacted by CLARK's family, who stated that they again observed ~~THOMPSON~~ **[the perpetrator]** walking past the residence in work clothing and immediately recognized him."[137] The affidavit never specifies who recognized the perpetrator, how she recognized him, or whether she was an eyewitness to the original incident. More importantly, even if the affidavit explained that a victim eyewitness recognized the perpetrator, the reconstructed affidavit does not explain how this identification was connected to Thompson.

By dispelling the misrepresentation that Thompson could clearly be observed in the surveillance footage, the reconstructed affidavit exposes that Bolt never described how Thompson was identified. According to the second amended complaint, Bolt connected Warden's incident report with Sierra and Clark's pictures of Thompson. But he excluded this truthful account of Thompson's identification from his affidavit. Because of this gap, the facts as set forth in the reconstructed affidavit provide no account of how Thompson was reliably identified and connected to the crime, and therefore give a reasonable magistrate

---

identifying witness should select."); *Manson v. Braithwaite*, 432 U.S. 98, 133 (1977) ("single-suspect procedures have 'been widely condemned'") (quoting *Stovall v. Denno*, 388 U.S. 298, 302 (1976)).

[137] Doc. 62-3 at 7.

no basis on which to conclude that there is a "fair probability" that Thompson committed the crime.[138]

Bolt's qualified immunity defense does not bar Thompson's Section 1983 false arrest, false imprisonment, and malicious prosecution claims. The Third Circuit has dismissed qualified immunity defenses in other reconstructed affidavit cases with little analysis, stating that "[t]here is no question that . . . the right to be free from arrest except on probable cause, [is] clearly established," and "grounded in well-settled law."[139] "Similarly, the right to be free from prosecutions on criminal charges that lack probable cause was also known and clearly established."[140] "And no reasonable officer would have covered up a lack of probable cause by recklessly disregarding the truth in an affidavit."[141] Therefore, Bolt's qualified immunity defense is unavailable, and his motion to dismiss Thompson's Section 1983 Fourth Amendment claims is denied.

---

[138] As explained above, the Court does not insert the full inculpatory context of this identification into Bolt's affidavit. Even if it did, it is plausible that probable cause was lacking from the reconstructed affidavit because "glaring discrepancies . . . can undermine the reliability of an eyewitness who provides a positive identification." *Andrews v. Scuilli*, 853 F.3d 690, 702 (3d Cir. 2017) (quoting *Wilson*, 212 F.3d at 791). It is plausible that the perpetrator's forehead "fall[s] well outside commonsense margins of error that typically apply to witness' subjective observations involving estimation or approximation." *Id.* at 702 n.14; *see also Pinkney*, 2024 U.S. Dist. LEXIS 5853, at *9 (reconstructed affidavit lacked probable cause where among other exculpatory facts the suspect, based upon witness's description, had distinct hair from the plaintiff). A "brighter light" is also cast on identifications where "only one witness as the source of information about a crime and perpetrator." *Id.* at 704; *see also Pinkney*, 2024 U.S. App. LEXIS, at *8 (citing *Andrews* for this proposition).

[139] *Andrews*, 853 F.3d at 705.

[140] *Id.*; *Donahue v. Gavin*, 280 F.3d 371, 379 (3d Cir. 2002).

[141] *Pinkney*, 2024 U.S. App. LEXIS 5853, at *10 (citing *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993)).

### C.    Municipal Section 1983 Claims

A municipal body is a "person" which can be liable under Section 1983.[142] Municipalities are only liable for their own acts, not the acts of their employees. Municipalities act through a "policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."[143] This includes practices "so permanent and well settled as to constitute a custom or usage with the force of law."[144] It also includes a municipality's "deliberate indifference to constitutional rights" through deficient training or supervision.[145] A Section 1983 claim against a municipality must show (1) an underlying constitutional violation (2) caused by the municipality's execution of municipal policy, custom or training[146] (3) causing the constitutional harm.[147]

### 1.    Section 1983 Claims Against Williamsport

Thompson pleads a Section 1983 claim against the City of Williamsport for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Most of these claims require little discussion. First, as explained above, Thompson's second amended complaint shows no underlying Fifth or Fourteenth Amendment violation. Second, this Court explained in its prior Opinion that it could conceive

---

[142] *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 690 (1978). A municipality and its departments are treated as a single entity. *Jackson v. City of Erie Police Dep't*, 570 F.App'x 112, 114 (3d Cir. 1997); *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997).
[143] *Id.*
[144] *City of St. Louis v. Prapotnik*, 485 U.S. 112, 117 (1978).
[145] *City of Canton v. Harris*, 489 U.S. 378, 388, 392 (1989)
[146] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).
[147] *Canton*, 489 U.S. at 385.

of no set of facts supporting Bolt's personal involvement in Thompson's retaliatory prosecution or excessive bail under the First and Eighth Amendments.[148] The second amended complaint still ties neither Thompson's prosecution nor his bail to any act or policy by Williamsport or its agents.[149] It only details actions by the District Attorney's Office in Thompson's prosecution and bail. As such, Thompson's First, Fifth, Eighth, and Fourteenth Amendment claims against Williamsport are dismissed with prejudice. That leaves Thompson's Fourth Amendment claims.

An official decisionmaker's act can be considered policy attributable to the municipality,[150] but Thompson's argument that Bolt is a policymaker falls flat. Even township police chiefs are not policymakers under Pennsylvania law,[151] nor does Thompson allege that Bolt is "responsible for establishing final government policy"[152] respecting any activity which could cause his Fourth Amendment harms. Thompson's argument that Bolt's conduct has created a custom attributable to

---

[148] Officers can be liable where they cause bail to be excessive by "manipulating," "helping to shape, and exercising significant influence over, the bail decision." *Wagenmann v. Adams*, 829 F.2d 196, 211-12 (1st Cir. 1987) (Selya, J.); *James v. York Cnty Police* Dep't, 160 F.App'x 126, 133 (3d Cir. 2005) (unpublished) (citing *Wagenmann* for this proposition). But this Court is unaware of any case even approaching the unique circumstances here: where an officer's delayed disclosure of exculpatory evidence, discovered *after* an initial bail hearing, renders the already-set bail excessive and thereby prolongs imprisonment.

[149] *See supra* n.97.

[150] *Parker v. Sch. Dist. of Phila.*, 364 F.Supp.3d 738 (E.D. Pa. 2018).

[151] *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 n.11 (3d Cir. 2010) (citing 53 Pa. Cons. Stat. Ann. § 66902).

[152] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 482-83 (1986).

Williamsport[153] also fails because Thompson only pleads one plausible constitutional violation by Bolt.[154] "A policy cannot ordinarily be inferred from a single instance of illegality such as a first arrest without probable cause."[155]

A failure to train or supervise can also support municipal liability if that failure amounts to a "deliberate indifference" to the rights of persons with whom employees will come into contact.[156] "'[D]eliberate indifference' is a stringent standard of fault."[157] "A pattern of similar constitutional violations" is ordinarily necessary "to demonstrate deliberate indifference for purposes of failure to train."[158] Thompson's argument that Bolt's actions evidence a pattern of similar violations,[159] like Thompson's custom argument, fails because one violation does not create a plausible inference of a pattern of violations.

Absent a pattern of violations, municipal liability only attaches if the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."[160] Liability in such "single-incident" cases depends upon "[t]he likelihood that the situation will

---

[153] Brief in Opposition to Williamsport and Lycoming's Motion to Dismiss, Doc. 72 at 8 (quoting *Losch v. Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984)).

[154] See *Connick v. Thompson*, 563 U.S. 1, 63 n.7 (2011).

[155] *Losch*, 736 F.2d at 911.

[156] *Canton*, 489 U.S. at 385.

[157] *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 410 (1997).

[158] *Connick*, 563 U.S. at 62.

[159] *Id.*

[160] See *Canton*, 489 U.S. at 390 n.10.

recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights."[161]

Thompson alleges that Williamsport provides no training to its officers "concerning the constitutional necessity to provide truthful statements within Affidavits of Probable Cause, and/or to avoid misstatements such as those" present in Bolt's affidavit.[162]  While writing an affidavit of probable cause does not require "split-second" decision-making,[163] the Third Circuit has held that failing to train on the warrant-creation process can cause similar Fourth Amendment violations. In *Berg v. County of Allegheny*, summary judgment was denied despite a lack of similar violations where an untrained court clerk accidentally transposed two numbers, resulting in an erroneously issued warrant causing the plaintiff's arrest.[164]

As in *Berg*, Williamsport's alleged failure to train on the warrant-creation process would foreseeably cause similar violations to recur as officers author more affidavits in the future. "Attorneys, unlike police officers, are equipped with the tools to find, interpret, and apply legal principles."[165] That is why failing to train officers on disclosing exculpatory *Brady* material, for example, plausibly supports

---

[161] *Bryan Cnty*, 520 U.S. at 409.
[162] Second Amended Complaint, Doc. 62 ¶96.
[163] *Connick*, 563 U.S. at 64 ("Armed police must sometimes make split-second decisions with life-or-death consequences.").
[164] 219 F.3d 261, 266 (3d Cir. 2000).
[165] *Connick*, 563 U.S. at 69-70; *see also Thomas v. Cumberland Cnty*, 749 F.3d 217, 225 (3d Cir. 2014).

municipal liability under a single-incident theory.[166] Similarly, deciding what information is material to the probable cause analysis is fact-intensive and legally demanding. Without training on the importance of including material exculpatory information in affidavits, it is foreseeable that officers would recklessly omit that information to secure arrest warrants, causing similar constitutional violations. In an opinion issued earlier this month by my colleague, the Honorable Jennifer P. Wilson, this Court denied dismissal under the same failure to train theory.[167]

Because the failure to train officers on what to include in affidavits of probable cause plausibly supports Williamsport's deliberate indifference to similar constitutional violations, Williamsport's motion to dismiss is denied with respect to Thompson's Section 1983 Fourth Amendment claims.

## 2.   Section 1983 Claims Against Lycoming County

While prosecutorial decision-making is protected by absolute immunity,[168] this protection does not extend to policymaking or administrative acts.[169] Thompson seeks Section 1983 relief for the District Attorney's Office's delay in uncovering and disclosing exculpatory evidence, its reliance on unreliable

---

[166] *Watson v. Witmer*, 183 F.Supp. 3d 607, 615 (M.D. Pa. 2016)

[167] *Roberts v. Lau*, No. 1:21-CV-1140, 2024 U.S. Dist. LEXIS 59973, at *12-13 (M.D. Pa. Apr. 1, 2024) ("While this is a single-incident theory, it is obvious that detectives run a high risk of violating an individual's constitutional rights when drafting affidavits of probable cause, which initiate criminal proceedings against an individual, such that failing to train officers in what to include in an affidavit of probable cause poses such an obvious risk that it could be considered deliberate indifference.").

[168] *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976).

[169] *White v. Brown*, Civil Action No. 08-606-ER, 2010 U.S. Dist. LEXIS 41583, at *25-26 (D. Del. Apr. 28, 2010).

eyewitness identification, its retaliatory prosecution, and his excessive bail, by arguing that these injuries resulted from the District Attorney's policies, customs, inadequate training, or inadequate supervision.[170] All claims fail without reaching the merits because Thompson does not plausibly allege that the District Attorney's Office was deliberately indifferent to the risk of such violations.

Thompson claims that his injuries were caused by the District Attorney's "policies," but his allegation is that the lack of policies caused the injury. These claims then sound in a training or supervision theory.[171] Such claims fail. Thompson has not alleged any pattern of similar violations. His so-called "noxious cascade of sequential events"[172] relates to alleged violations of different rights and does not provide any notice to the District Attorney's Office.[173] Moreover, "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide 'notice to the [county] and the opportunity to conform to constitutional dictates.'"[174]

As with Thompson's claims against Williamsport, liability may only be had on a single-incident liability theory.[175] But as prosecutors are legally trained, a failure to train or supervise them can never support a municipality's deliberate

---

[170] Second Amended Complaint, Doc. 62 at 20-22.
[171] *See Canton*, 489 U.S. at 388-389.
[172] Brief in Opposition to Lycoming County's Motion to Dismiss, Doc. 71 at 9.
[173] See *Connick*, 749 F.3d at 62-63 (Despite four reversals in the same prosecutor's office due to Brady violations within the past ten years, none of those cases involved failure to disclose physical or scientific evidence, so they provided no notice of similar violations).
[174] *Connick*, 563 U.S. at 63 n.7.
[175] See *Canton*, 489 U.S. at 390.

indifference to constitutional violations.[176] Absent such a pattern, all of Thompson's claims based on the District Attorney's Office's actions fail. Because Thompson has already had "two bites at the apple" yet pleads no new evidence of a pattern of violations, an opportunity to amend would be futile.[177] All Section 1983 claims against Lycoming County are dismissed with prejudice.

### D.   State Law Intentional Infliction of Emotional Distress Claim Against Bolt

Though Thompson's IIED claim now requires closer scrutiny, it remains deficient as it is not plausible that Bolt engaged in extreme or outrageous conduct. "The elements of intentional infliction of emotional distress are: (1) a person who by extreme and outrageous conduct (2) intentionally or recklessly causes (3) severe emotional distress to another."[178] The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."[179]

"Courts that have found that a claim existed for intentional infliction of emotional distress in connection with an arrest have done so where the plaintiff was physically injured by the officers, or where the officer's conduct was

---

[176] *Connick*, 563 U.S. at 63. Courts have criticized this logic, but the "grim reality" is that "this Court must abide by the precedential constraints placed on it," even if plaintiffs are deprived of "redress for constitutionally unsound prosecutions that wreaked unimaginable havoc in their lives." *Smith v. Silvernail*, No. 22-cv-00045, 2024 U.S. Dist. LEXIS 27415, at *38-39 (S.D. Ohio Feb. 16, 2024).

[177] *See Lemons v. Meguerian*, No. 23-1090, 2024 U.S. App. LEXIS 7316, at *11 (3d Cir. Mar. 28, 2024) (unpublished) (citing *Lake v. Arnold*, 232 F.3d 360, 373 (3d Cir. 2000)).

[178] *Carson v. City of Phila.*, 574 A.2d 1184 (Pa. Cmwlth. 1990).

[179] *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998); *Reedy*, 615 F.3d at 231-32.

otherwise exceptionally reprehensible."[180] IIED claims have been supported by "alleg[ations] that [an] [o]fficer commenced criminal charges against [a plaintiff] knowing that they were false and without probable cause," where accompanied by additional outrageous facts.[181] For example, IIED claims survive where the "nature as well as the number" of charges "suggest an intent to sensationalize the issue."[182]

But the threshold for successful IIED claims is extraordinarily high.[183] As "the definition of 'outrageousness' is subjective and nebulous . . . the availability of recovery for IIED is 'highly circumscribed.'"[184] In IIED cases, "it has not been enough [to allege] that the defendant has acted with an intent which is tortious or even criminal" to show extreme and outrageous conduct.[185] Falsely initiating a

---

[180] *Shaffer v. City of Pittsburgh*, No. 14-1674, 2015 U.S. Dist. LEXIS 107963, at *24 (W.D. Pa. July 7, 2015) (Mitchell, M.J.) (citing cases), *report and recommendation adopted*, 2015 U.S. Dist. LEXIS 107315, *aff'd*, 2016 U.S. App. LEXIS 9581 (3d Cir. July 7, 2016) (unpublished); *see also Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979). ("Intolerable professional conduct" can be considered extreme and outrageous).

[181] *Sheare*, 2012 U.S. Dist. LEXIS 90370, at *5, *22-23; *Dempsey*, 2012 U.S. Dist. LEXIS 62043, at *70-71; *Bayas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. Super. Ct. 1981); *Valdetarro v. Vollrath*, Civil Action No. 02-CV-2870, 2002 U.S. Dist. LEXIS 25266, at *11 (E.D. Pa. Dec. 24, 2002); *Watson v. Haverford Twp. Police Dep't*, No. CIV.A. 10-6731, 2011 U.S. Dist. LEXIS 60858, at *16-17 (E.D. Pa. June 6, 2011); *Watson v. Abington Twp.*, No. CIV.A.01-5501, 2002 U.S. Dist. LEXIS 16300, at *1, 9 (E.D. Pa. Aug. 15, 2002); *Gilbert v. Feld*, 788 F.Supp. 854, 857 (E.D. Pa. 1992); *McCoy-Jones v. Ind. Borough*, Civil Action No. 12-152, 2012 U.S. Dist. LEXIS 120737, at *20-23 (W.D. Pa. Aug. 24, 2012). *See also* Rest. 2d Torts §46, cmt. k.

[182] *Gleeson v. Robson*, No. 3:CV-02-1747, 2005 U.S. Dist. LEXIS 43310, at *24-25, 30 (M.D. Pa. May 6, 2005) (Vanaskie, J.).

[183] *See DeHart v. Homeq Servicing Corp.*, 47 F.Supp. 3d 246 (E.D. Pa. 2014).

[184] *Gray v. Huntzinger*, 147 A.3d 924, 927 (Pa. Super. Ct. Aug. 30, 2016) (citing *Kazatzky v. King Memorial Park*, 527 A.2d 988, 995 (Pa. 1987)).

[185] *Hoy*, 720 A.2d at 754 (quoting Rest. 2d Torts § 46 cmt. d (1977)).

criminal prosecution without probable cause ordinarily does not support a cause of action for IIED, even where the false arrest was intentionally orchestrated.[186]

If intentionally manufacturing false charges often does not qualify as "extreme and outrageous," the lesser evil of intentionally or recklessly omitting facts from an affidavit will rarely, if ever, qualify. In *Mastromatteo v. Simock*, the Eastern District of Pennsylvania held that where an officer manufactured facts to support his affidavit of probable cause, this conduct, while "certainly deplorable," "does not sink to the level that can properly be termed 'atrocious and utterly intolerable in a civilized society.'"[187] Subsequent courts have found similarly.[188]

Existing case law shows that Bolt's intentional or reckless omissions do not rise to an extreme or outrageous level; no additional outrageous facts are pled aside from the omissions themselves. Thompson does not plead that Bolt fabricated evidence or charges, or that he intentionally sensationalized Thompson's arrest.

---

[186] *See, e.g., Motheral v. Burart*, 583 A.2d 1180, 1190 (Pa. Super. Ct. 1990); *Simmons v. Poltrone*, No. Civ. A. No. 96-8659, 1997 U.S. Dist. LEXIS 20512, at *4-5 (E.D. Pa. Dec. 17, 1997); *Sugermann v. RCA Corp.*, 639 F.Supp. 780, 788 (M.D. Pa. 1985); *Griffin v. Municipality of Kingston*, No. 08-2290, 2009 U.S. Dist. LEXIS 53076, at *11 (M.D. Pa. June 23, 2009); *United States ex rel. Magid v. Barry Wilderman, M.D., P.C.*, Civil Action No. 96-CV-4346, 2005 U.S. Dist. LEXIS 2926, at *17-18 (E.D. Pa. Feb. 28, 2005); *Kuper v. Colonial Penn Ins. Co.*, Civ. A. No. 99-172, 1999 U.S. Dist. LEXIS 7179, at *16-17 (E.D. Pa. May 18, 1999).

[187] 866 F.Supp. 853, 859 (E.D. Pa. 1994) (quoting *Salerno v. Phila. Newspapers*, 546 A.2d 1168, 1172 (Pa. Super. Ct. 1988)).

[188] *Simmons*, 1997 U.S. Dist. LEXIS 20512, at *4-5; *Wise v. City of Phila.*, No. 97-2651, 1998 U.S. Dist. LEXIS 12149, at *14-15 (E.D. Pa. July 31, 1998); *Tarbox v. Butler Twp.*, No. 3:14-CV-01346, 2015 U.S. Dist. LEXIS 141833, at *23 (M.D. Pa. Oct. 19, 2015); *Moffitt v. Britton*, No. 3:21-cv-109, 2023 U.S. Dist. LEXIS 24406, at *16 (W.D. Pa. Feb. 9, 2023).

Nor does he allege that Bolt knew Thompson was not the true perpetrator. Thompson's IIED claim is therefore dismissed with prejudice.

### E.    Defendants Sierra and Clark

When Thompson filed his initial complaint in July 2022, Sierra and Clark were named as Defendants.[189] Following this Court's March 2023 Order lifting the stay upon Thompson's case,[190] service was attempted.[191] In April 2023, the service processor discontinued attempting service on Sierra and Clark.[192] Throughout Thompson's complaints, he has continued to name Sierra and Clark as Defendants,[193] yet has taken no further action to effect service.

"Federal Rule of Civil Procedure 41(b) permits a District Court to [*sua sponte*] dismiss a plaintiff's case for failure to prosecute."[194] "The failure by a plaintiff to timely serve a complaint upon the defendant(s) will be deemed a failure to prosecute."[195] But "dismissal with prejudice is only appropriate in limited circumstances and doubts should be resolved in favor of reaching a decision on the

---

[189] Complaint, Doc. 1.
[190] Order, Doc. 7.
[191] Summons Returned Unexecuted as to Dayna Sierra, Doc. 15; Summons Returned Unexecuted as to Sherry Clark, Doc. 17.
[192] *Id.*
[193] Amended Complaint, Doc. 37; Second Amended Complaint, Doc. 62.
[194] *Briscoe v. Klaus*, 538 F.3d 252, 258 (3d Cir. 2008).
[195] *Eve v. Lynch*, Civil No. 1:11-CV-01131, 2013 U.S. Dist. LEXIS 24538, at *20 (M.D. Pa. Feb. 22, 2013) (citing *Hamilton v. GSA*, No. 3:CV-10-1494, 2010 U.S. Dist. LEXIS 136592, at *3 (M.D. Pa. Dec. 1, 2010)).

merits."[196] The Court must "justify its decision under the multi-factor balancing test stated" by the Third Circuit in *Poulis v. State Farm Fire & Casualty Co*[197] and "provide the plaintiff with an opportunity to explain [his] reasons for failing to prosecute the case or comply with its orders prior to dismissing a case."[198] Accordingly, Thompson shall show cause why this Court should not dismiss his claims against Sierra and Clark for failure to prosecute by May 14, 2024.

## III.   CONCLUSION

All Defendants' motions to dismiss Thompson's Section 1985(3) claims are granted with prejudice, and all defendants' motions to dismiss Thompson's 1985(2) claims are granted without prejudice. Bolt's motion to dismiss is denied as to Thompson's Section 1983 Fourth Amendment claims; it is also denied as to Thompson's related state law false arrest, false imprisonment, and malicious prosecution claims.   The motion to dismiss is granted with prejudice as to Thompson's Fifth and Fourteenth Amendment claims. Williamsport's motion to dismiss Thompson's Section 1983 claims is denied as to Thompson's Fourth Amendment claims and granted with prejudice as to Thompson's remaining Section 1983 claims. Lycoming's motion to dismiss Thompson's Section 1983 claims is granted with prejudice.

---

[196] *Emerson v. Thiel College*, 296 F.3d 184, 190 (3d Cir. 2002) (citing *Adams v. Trustees of N.J. Brewery Employees' Pension Trust Fund*, 29 F.3d 863, 870 (3d Cir. 1994)).

[197] *Nieves v. Thorne*, 790 F. App'x 355, 357 (3d Cir. 2019) (citing *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863 (3d Cir. 1984)).

[198] *Briscoe*, 358 F.3d at 258 (citing *Emerson*, 296 F.3d at 191).

"Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility."[199]   A complaint is "futile" if, as amended, it would fail to state a claim upon which relief could be granted.[200] Excepting Thompson's Section 1985(2) claim, no further amendment will be permitted regarding the dismissed claims as another opportunity to plead them would be futile.[201]

An appropriate Order follows.

BY THE COURT:

_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge

---

[199] *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)).
[200] *Id.*
[201] *See Bjorgung v. Whitetail Resort, LP*, 550 F.3d 263, 266 (3d Cir. 2008).