**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

CECIL THOMPSON,

Plaintiff,

v.

CITY OF WILLIAMSPORT and
JASON P. BOLT,

Defendants.

No. 4:22-CV-01159

(Chief Judge Brann)

**MEMORANDUM OPINION**

**AUGUST 21, 2026**

## I. BACKGROUND

Plaintiff Cecil Thompson was arrested for a burglary in which the perpetrator threatened several children and their grandmother with a gun. He was in pre-trial detention for several months before his bail was reduced based on the introduction of exculpatory evidence. Eventually, enough evidence came to light that the state prosecutor declined to continue the case and the charges were *nolle prossed*. Thompson brought this federal civil rights lawsuit to recover damages for the arrest and prosecution, which he contends were initiated and continued unconstitutionally.

Defendants Jason P. Bolt (the police officer who investigated the case and applied for the arrest warrant) and the City of Williamsport have moved for summary judgment on all remaining counts. After review of the record, the Court grants the motion as to Williamsport and denies it as to Bolt.

## II. LAW

### A. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[2] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[3] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a prima facie case under applicable substantive law."[4]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[5] the Court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[6] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the

1 Fed. R. Civ. P. 56(a).
2 *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010).
3 *Clark v. Mod. Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993).
4 *Id.*
5 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).
6 *Razak v. Uber Techs., Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

Court may "consider the fact undisputed for purposes of the motion."[7] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[8]

**B. Undisputed Facts**

With that standard outlining the Court's framework for review, I now turn to the undisputed facts.

On May 18, 2020, Sherry Clark and her daughter, Dayna Sierra, returned to their duplex at 951 High Street in Williamsport, Pennsylvania, after running some errands.[9] As they parked, they noticed a man nearby who was acting suspicious (the "perpetrator").[10] He had a medical face mask around his chin, but he pulled it up after making eye contact with Sierra.[11] Sierra later testified that, in that time, the perpetrator "really made an impression," such that his face was "one that [she] do[es]n't forget."[12] Clark and Sierra brought their groceries into Clark's half of the duplex, and Sierra then checked outside for the perpetrator and, upon not noticing him, returned to her half of the property to get her husband.[13]

---

7 Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

8 Fed. R. Civ. P. 56(c)(3).

9 Doc. 94 (Statement of Undisputed Material Facts) ¶¶ 1-3, 5, 14, 47(b).

10 Doc. 94-42 (Dayna Sierra Dep.) at 19:10-23:25; Doc. 94 ¶ 47.

11 Doc. 94-42 at 19:25-20:4, 23:12-25, 33:13-23. It is worth noting that this incident occurred near the height of the COVID-19 pandemic, so a mask was not necessarily abnormal.

12 *Id.* at 27:6-28:8.

13 *Id.* at 21:18-22:20.

While Sierra was in her half of the duplex, the perpetrator approached Clark's side of the house from the rear and knocked.[14] Clark's grandchildren were downstairs and answered the door.[15] The perpetrator asked if "Lisa" was home, and, when the children said that no one named Lisa lived there, the perpetrator forced his way into the home and drew a small handgun.[16] After the children explained that the only other person in the home was Clark, who was upstairs, the perpetrator walked them all upstairs at gunpoint[17] and brought them to Clark's room.

Though held at gunpoint, Clark surprised the perpetrator by producing a billy club or heavy flashlight and began to beat him with it.[18] She managed to drive him down the stairs and out of her home without sustaining serious injuries.[19] As he fled, the perpetrator touched a doorknob and knocked down a picture frame—these items and the billy club were processed for forensic testing of fingerprints and DNA.[20] Additionally, Clark and Sierra had placed a number of surveillance cameras on the exterior of the duplex which captured footage of the perpetrator skulking about, walking past the house repeatedly and approaching from the rear, and, ultimately fleeing.[21]

---

14 Doc. 94 ¶¶ 12, 15, 19-25, 50.
15 *Id.* ¶¶ 12, 15, 50.
16 *Id.* ¶¶ 12, 15, 50.
17 *Id.* ¶¶ 12, 15, 47, 50.
18 *Id.* ¶¶ 12, 15, 47, 50.
19 *Id.* ¶¶ 12, 15, 47.
20 *Id.* ¶¶ 35-44.
21 *Id.* ¶ 19.

Police responded to the incident quickly, and Clark and Sierra gave an initial description of the perpetrator as an approximately six-foot tall black male with a skinny build, wearing black glasses, a grey hooded sweatshirt, and sweatpants, carrying a plastic bag.[22] One officer who responded reviewed the surveillance footage and shared a picture of the perpetrator with other officers.[23] A K-9 unit also arrived on scene and tried but failed to track the perpetrator.[24] After they were unable to locate the perpetrator on the day of the incident, Williamsport Police shared the photos and description of the perpetrator with other law enforcement agencies, including the Lycoming County Sheriff's Office.[25]

Three days later, on May 21, 2020, Lycoming County Sheriff's Deputies were serving process in the area of the incident when they encountered a man who largely matched the perpetrator's description.[26] After a third deputy joined for support, the three deputies approached the man and asked for his identification, explaining that he matched the description of the perpetrator.[27] The individual provided a driver's license identifying him as Plaintiff Cecil Thompson.[28]

Thompson explained that he was in the neighborhood because he was walking from a nursing home on Rose Street (to the west of the duplex), where he worked in

---

22 *Id.* ¶¶ 28-29, 31-32, 53-57.
23 *Id.* ¶¶ 8-10.
24 *Id.* ¶ 16.
25 *Id.* ¶ 51.
26 *Id.* ¶¶ 58-60.
27 *Id.* ¶¶ 65-73.
28 *Id.* ¶¶ 74-75.

food services, to his home on Second Avenue (to the east of the duplex).[29] Thompson's appearance bore this explanation out: the Deputies observed that he wore black chef pants and kitchen shoes.[30] Although he looked somewhat younger than the individual in the surveillance photos, Thompson otherwise matched the perpetrator's description.[31] The encounter lasted approximately 7 minutes before Thompson left and walked in the direction of his apartment.[32]

On June 5, 2020, Defendant Williamsport Police Agent Jason Bolt, who had been assigned to investigate the case, received an email from Sierra's husband, Moises, reporting that they had seen a man they believed to be the perpetrator walking by the duplex.[33] They included a surveillance photo depicting a man who appeared to match the perpetrator's description wearing a grey kitchen worker's smock and black pants.[34] Two days later, Clark called 911 and reported that she believed she had just seen the perpetrator again.[35] When police responded, Clark stated that she had seen the same man as on June 5, wearing the same clothes.[36]

---

29 *Id.* ¶¶ 78-79.
30 *Id.* ¶ 77.
31 *Id.* ¶ 80.
32 *Id.* ¶ 82.
33 *Id.* ¶¶ 84-86. Thompson objects to this statement of fact only insofar as Defendants' language frames him as the perpetrator, which he denies. Doc. 104 (Response to SOUMF) ¶ 84. I have reframed the language in Thompson's favor, even though the email as described in the exhibits was stated with more certainty. *See* Doc. 94-5 (Bolt Investigative Report) at 5.
34 Doc. 94 ¶¶ 85-86. After he was arrested, Thompson was shown this photo and agreed that he was the man depicted. *Id.* ¶ 120.
35 *Id.* ¶ 87.
36 *Id.* ¶¶ 88-96.

On June 25, 2020, Bolt went to the nursing home where Thompson worked and spoke with Zaria Cooper, a Human Resources employee.[37] According to Cooper, Bolt and several other officers entered with weapons drawn, but lowered them when Bolt began to speak to Cooper.[38] Bolt then showed Cooper a single photograph of Thompson in his work uniform, and asked if she knew who he was.[39] From the record, it does not appear that this photo was one of the surveillance photos taken of the perpetrator on the day of the invasion, or one of the post-incident photos sent to Bolt by the victims.[40] Cooper confirmed that she knew that it was Thompson "[b]ased on his entire work uniform and his glasses."[41] Later that day, Cooper sent Bolt a copy of Thompson's May work schedule and time cards which showed that he had not been working on May 18.[42]

Over the course of the next month, Clark, Sierra, and Moises continued to contact Bolt with surveillance pictures of men they believed to be the perpetrator walking past the duplex.[43] They believed that it was the same man—the one who walked by on June 5 and 7—each time.[44]

---

37 *Id.* ¶ 99.

38 Doc. 94-41 (Zaria Cooper Dep.) at 27:13-28:6. Cooper and Bolt's recollections of this event differ substantially, and I develop that dispute in the analysis below. For now, applying the summary judgment standard, the Court describes the event from Cooper's more Plaintiff-friendly account and eschews discussion of Bolt's recollection.

39 Doc. 104 ¶¶ 100-101; Doc. 94-41 at 17:2-18:3, 28:11-15, 30:17-24.

40 *See* Doc. 94-41 at 30:17-36:5; *cf.* Doc. 94-19 (Photos).

41 Doc. 94-41 at 28:11-15.

42 Doc. 94 ¶¶ 106-07.

43 *Id.* ¶¶ 108-09

44 *See* Doc. 94-42 at 44:6-51:6.

On July 28, 2020, the Lycoming County District Attorney approved charging Thompson for the invasion.[45] Bolt filed a criminal complaint charging Thompson with relevant offenses later that day.[46] The complaint included an Affidavit of Probable Cause (the "Affidavit") that stated, in full:

> On Monday May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home invasion/attempted robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with victim SHERRY CLARK, who stated that B/M (later identified as CECIL THOMPSON, D.O.B. [redacted]) had knocked on the rear door and asked her 10-year old granddaughter to see "Lisa." When the juveniles replied that no one by that name lived there and began to close the door, THOMPSON forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles (a 9-yr old female, 10-yr old female and 15-yr old male) and told them to "get on the ground and be quiet" or he would shoot them. After asking about the other occupants in the residence, THOMPSON then paraded the trio of juveniles to a second-floor bedroom where CLARK was. THOMPSON then pointed the firearm at CLARK before telling her and the juveniles to all "be quiet and sit down" inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at THOMPSON, which then began a brief altercation in which THOMPSON struck CLARK in the head, knocking her to the floor. THOMPSON continuously told CLARK that he would shoot her, however CLARK continued to strike THOMPSON in the legs. THOMPSON eventually ran from the bedroom and fled out of the residence.
>
> While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing recordings THOMPSON could be observed clad in a grey/black hooded sweatshirt, blue jeans and white sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. THOMPSON is observed to stop and watch CLARK and another adult female carrying groceries into house,

[45] Doc. 94 ¶ 111.
[46] *Id.* ¶¶ 112-13.

> after which he raises his mask onto his face and approaches the residence.
>
> On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed THOMPSON walking past the residence in work clothing and immediately recognized him. A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as THOMPSON.[47]

Magisterial District Judge Christian Frey issued an arrest warrant for Thompson later that day.[48]

Williamsport Police executed the arrest warrant at approximately 3:00 p.m. on July 28, 2020, while Thompson was at work.[49] Thompson waived his *Miranda* rights and agreed to sit for a post-arrest interview with Bolt.[50] In the interview, Thompson denied the charges and rejected the suggestion that he was depicted in the surveillance photos from the incident, but agreed that he frequently walked down High Street on his way to and from work and that the June 5 surveillance photo was of him.[51] Thompson further volunteered to provide a DNA sample after Bolt stated that the perpetrator had touched items in the home during the invasion, and consented to a search of his phone.[52] A search warrant executed at Thompson's home

---

47 Doc. 94-29 (Criminal Compl.) at 6.
48 Doc. 94 ¶ 116.
49 *Id.* ¶ 117.
50 *Id.* ¶ 118.
51 *Id.* ¶ 120.
52 *Id.*

resulted in the recovery of white shoes and black eyeglasses similar to those worn by the perpetrator.[53]

Following Thompson's arrest, Sierra identified him as the perpetrator in a photo array.[54] And at a preliminary hearing, Sierra and Clark's grandson both identified Thompson as the perpetrator.[55] Sierra also detailed the instances of individuals that she believed to be the perpetrator walking past her house after the incident, and stated that she believed it was Thompson walking by each time.[56] Notably, every witness at the preliminary hearing described the perpetrator as having a distinctive forehead.[57] Indeed, Bolt specifically acknowledged that "it would be memorable, which is why everyone seems to remember it."[58] At the end of the hearing, Judge Frey bound the charges over for trial.[59]

Despite the weight of the initial evidence against Thompson, exculpatory evidence began to mount in the ensuing months. The Pennsylvania State Police Bureau of Forensic Services analyzed the latent fingerprints gathered from the duplex and on September 29, 2020, produced a report that <u>excluded</u> Thompson as a

---

53 *Id.* ¶¶ 121-23.

54 *Id.* ¶¶ 124-30.

55 *Id.* ¶¶ 138-39, 142. Thompson admits that these identifications occurred but denies that they were correct. Doc. 104 ¶¶ 139, 142.

56 Doc. 94 ¶¶ 140-41. *See* Doc. 94-36 (Preliminary Hr'g Tr.) at 44:3-15. Thompson again admits the content of Dayna's statements but denies that she was correct. Doc. 104 ¶ 140.

57 Doc. 94-36 at 19:19-24, 20:6-7, 27:17-28:13, 48:17-49:9, 76:6-77:9, 80:8-19, 91:9-92:7.

58 *Id.* at 92:5-7.

59 Doc. 94 ¶ 144.

source of the prints.[60] On this basis, Thompson's bail was reduced, and he was eventually released from pre-trial detention.[61] On February 23, 2021, the Bureau of Forensic Services produced a second report, this time excluding Thompson as a source of the DNA recovered at the duplex.[62] And, around the same time, Thompson's counsel produced records showing that Thompson's account was signed on to his Xbox at the time of the invasion.[63] Approximately a year-and-a-half later, the Lycoming County District Attorney entered a *nolle prosequi* in Thompson's case.[64]

After his criminal case ended, Thompson proceeded with this federal civil rights lawsuit. He initially named the City of Williamsport, Lycoming County, Bolt, Clark, Sierra, Cooper, and the nursing home where he worked as Defendants.[65] Following motions to dismiss, Thompson stipulated to the dismissal with prejudice of Cooper and the nursing home.[66] The Court then granted the remaining Defendants' motions to dismiss, but provided Thompson leave to amend his complaint.[67] Thompson did so,[68] and the Defendants again moved for dismissal. The Court granted Lycoming County's motion, and granted in part and denied in part

---

60 *Id.* ¶¶ 145-48.
61 *See* Doc. 94-44 (Cecil Thompson Dep.) at 119:4-121:1.
62 Doc. 94 ¶ 151.
63 *Id.* ¶ 150.
64 Doc. 6-1 (State Court Order of Dismissal).
65 Doc. 1 (Compl.); Doc. 37 (First Am. Compl.).
66 Doc. 58 (First Stipulation of Dismissal).
67 Doc. 60 (First Dismissal Op.).
68 Doc. 62 (Second Am. Compl.).

Williamsport and Bolt's, permitting Thompson's suit to continue on his Fourth Amendment claims as well as several related state tort claims.[69] Shortly thereafter, Thompson voluntarily dismissed Clark and Sierra as Defendants.[70] The case then proceeded to discovery as to Williamsport and Bolt—the two remaining Defendants. After discovery, Williamsport and Bolt moved for summary judgment on all remaining claims.[71] That motion is fully briefed and ripe for disposition. For the following reasons, it is granted in part and denied in part.

### C. Analysis

Still live in this suit are Thompson's 42 U.S.C. § 1983 claims against Bolt bringing theories of violations of the Fourth Amendment for false arrest, false imprisonment, and malicious prosecution, parallel claims under Pennsylvania state tort law, and a Section 1983 *Monell* liability claim against Williamsport for failing to train officers on how to draft affidavits of probable cause.[72] I will start with the claims against Bolt and then turn to the claim against Williamsport.

#### 1. Bolt

As I have explained twice before, the false arrest, false imprisonment, and malicious prosecution claims all "share[] the core element that probable cause must be lacking."[73] And, as has been the case with each dispositive motion, "probable

---

69 Doc. 74 (Second Dismissal Op.).
70 Doc. 76 (Second Stipulation of Dismissal).
71 Doc. 95 (Mot. for Summ. J.).
72 *See* Doc. 74 at 17-33 (denying motion to dismiss on these claims).
73 Doc. 74 at 17 (quoting Doc. 60 at 14).

cause is the only element of these torts disputed by the parties."[74] The pending motion as to Bolt therefore turns solely on whether the Affidavit—properly viewed—establishes probable cause.

Under Third Circuit precedent, to succeed on a Fourth Amendment claim for false arrest (or imprisonment or malicious prosecution) in a case (like this one) where the plaintiff was arrested pursuant to a warrant application that facially established probable cause and was approved by an independent magistrate,[75] the plaintiff must demonstrate that: "(1) the police officer 'knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;' and (2) that 'such statements or omissions are material, or necessary, to the finding of probable cause.'"[76] In order to correctly conduct the materiality analysis, the Court "must perform a word-by-word reconstruction of the affidavit," "includ[ing] both the recklessly omitted information and . . . other information that gives it context."[77]

---

74 *Id.*

75 *See* Doc. 74 at 18 (citing *Messerschmidt v. Millender*, 565 U.S. 535, 546-57 (2012)); *Pinkney v. Meadville, Pa.*, 95 F.4th 743, 747-48 (3d Cir. 2024).

76 *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).

77 *Dempsey v. Bucknell Univ.*, 834 F.3d 457, 474-75 (3d Cir. 2016) (citing *United States v. Frost*, 999 F.2d 737 (3d Cir. 1993)). This analysis is the first stage of a two-step inquiry for evaluating a qualified immunity defense, *Saucier v. Katz*, 533 U.S. 194, 201 (2001), and the steps of the *Saucier* test can be conducted "in any order, at [the Court's] discretion," *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

When I previously considered whether the Affidavit contained false statements or omissions, I determined that Thompson's complaint, read in the light most favorable to him, supported the "infer[ence] that Bolt intentionally or recklessly omitted three key facts at the time of the arrest."[78] First, the complaint alleged that Cooper identified Thompson in a situation where "[o]fficers confronted [her] with 'rifles drawn,' showed her a pixelated image of the perpetrator, and asked if it depicted Thompson."[79] Second, Bolt's use of Thompson's name when referring to the perpetrator "misrepresent[ed] the footage's quality and omit[ted] the uncertainty clouding [his] review of the photographs and recordings."[80] And, third, based on the frequency of statements regarding the perpetrator's forehead, I found it "plausible both that [it] was so unique that it was observed by and known to Bolt, and so unique as to be materially exculpatory" such that it should have been included in the Affidavit.[81]

After identifying these alleged omissions and misrepresentations, I added them into a reconstructed version of the Affidavit and found that "it [was] plausible that Bolt lacked probable cause to arrest Thompson."[82] I reached that conclusion because, on the allegations of the complaint, "Cooper's identification [was] so

[78] Doc. 74 at 20.
[79] *Id.* at 20-21.
[80] *Id.* at 21.
[81] *Id.* at 21-22.
[82] *Id.* at 23-25.

suggestive that it cannot be considered reliable," and, without that identification or any other detail about how the victim eyewitnesses' identifications were connected to Thompson, "the reconstructed affidavit expose[d] that Bolt never described how Thompson was identified."[83] Without that connection, there was no probable cause to arrest Thompson.

Following discovery, some of the relevant facts have changed. But the Affidavit, reconstructed based on the summary judgment record, suffers from the same defect as it did at the motion to dismiss stage—albeit for a slightly different reason. After reviewing each alleged misrepresentation and omission and revising the Affidavit, the Court again concludes that a jury could find that probable cause was lacking, and summary judgment must therefore be denied.[84]

Beginning with the most important issue, Cooper's photo identification, Cooper's testimony has clearly established that the officers did not suggest Thompson's name, and that Bolt instead "specifically said he needs to identify a person who might be a suspect in an investigation that he's doing. And then he showed me [(Cooper)] the photo, and that's when I identified the person as Cecil Thompson. I was the one who said that in the photo that that was Cecil Thompson."[85] Moreover, the photo Bolt showed Cooper was not particularly blurry or pixelated: it

---

[83] *Id.* at 26-28.

[84] *Dempsey*, 534 F.3d at 467 (citing *Montgomery v. De Simone*, 159 F.3d 120, 124 (3d Cir. 1998)).

[85] Doc. 94-41 at 32:3-16; *see id.* at 17:19-18:3.

"was very, very clear."[86] Although it is true that officers entered with guns drawn,[87] Cooper's identification occurred after she and Bolt had moved into her office and the officers had lowered their weapons and were awaiting further instruction.[88] So the suggestive circumstances of the identification were significantly less severe than previously alleged.

However, the parties genuinely dispute which photo Bolt showed to Cooper. Bolt recalls that he first showed her a surveillance footage photo of the perpetrator from the day of the incident, which she independently identified as Thompson.[89] He then showed her one of the post-incident surveillance footage photos of an individual who the victims identified as the perpetrator, and Cooper confirmed that that photo also depicted Thompson.[90] Finally, Bolt showed her a driver's license photo of Thompson, which she agreed was Thompson.[91] Cooper recalls the interaction differently, and testified that she was only shown one photo which was different from any of the three photos that Bolt identified in his deposition.[92] She also denied having seen any of the other photos that the victim eyewitnesses emailed to Bolt.[93] The photo she does remember seeing depicted an individual in a work uniform like

---

86 *Id.* at 33:2-6.
87 *Id.* at 27:18-28:1.
88 *Id.* at 28:2-10.
89 Doc. 94-40 (Jason Bolt Dep.) at 19:2-13.
90 *Id.* at 19:14-24.
91 *Id.* at 19:24-20:5; *see* Docs. 94-19 – 94-21 (Photos).
92 Doc. 94-41 at 30:17-32:3 (denying having ever seen the photos depicted in Docs. 94-19 – 94-21), 35:21-36:5 (denying having seen the photos before this litigation).
93 *Id.* at 33:12-34:23.

Thompson's with a surgical mask on his chin and holding a bag, standing on a street corner beside a light pole with flowers on it, with a red brick road in the background.[94] That description is similar, but not identical, to the post-incident photo that Bolt says he showed to Cooper.[95]

On a motion for summary judgment, the Court may not weigh the evidence or make credibility determinations.[96] Instead, where the record contains two conflicting accounts of the same event from witnesses with firsthand knowledge, the Court is obligated to accept as true the account that is more favorable to the nonmovant and "disregard all evidence favorable to the moving party that the jury is not required to believe."[97] Under that standard, Cooper's account, taken as true, indicates that Bolt did not show her a picture of Thompson that the victims sent to him. The picture's source is entirely unclear.[98] But if it did not come from the victims, then the same disconnect between the victim eyewitnesses' identification of the suspect and the subsequent identification of Thompson highlighted at the motion to dismiss stage persists at this point of the litigation.

---

94 *Id.* at 17:2-18.

95 *See* Doc. 94-19 (Photos).

96 *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citing *Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990)).

97 *Id.* at 151.

98 Defendants do not engage with this disconnect at all, and simply maintain, in contradiction to the factual record, that "[t]he photo which Cooper identified was a photo that was supplied to Officer Bolt by the victims of the home invasion which they represented was the person that committed the home invasion." Doc. 106 (Reply) at 1. As noted, counsel showed all of those photos to Cooper at her deposition and she denied having ever seen any of them. *See supra* note 92.

The evidence has also clarified the other alleged misrepresentations or omissions, but they are less material for the determination of probable cause.

As to the quality of the security camera footage, the videos are now in the record,[99] and the Court has reviewed them. The footage, although not the clearest imaginable, is of sufficient quality that some facial features can be discerned. I will therefore adjust the language used in the reconstructed Affidavit to accurately describe the security footage.

And, viewed in the light most favorable to Thompson, the record now includes evidence from which a jury may be able to conclude that the victim eyewitnesses described the perpetrator's distinctive forehead to Bolt at some point before he prepared the Affidavit.[100] Accordingly, Bolt should have included that potentially exculpatory information. However, the Court cannot conclude that Bolt acted improperly by omitting any statement that Thompson *lacked* such a prominent forehead. When the victim eyewitnesses discussed the perpetrator's forehead at the preliminary hearing, they did so in essentially the same breath as making in-court identifications of Thompson as the perpetrator. Clearly, then, they believed that Thompson's forehead was sufficiently similar to the one they remembered from the

---

99 *See* Docs. 94-6 – 94-11.

100 *See* Doc. 94-40 at 55:2-21; *but see id.* at 57:18-58:4 (cannot recall mention of forehead before the arrest), 58:8-59:10 (cannot recall specific mention of forehead before preliminary hearing), 66:23-67:17 (deferring to recordings of interviews regarding mention of forehead); Doc. 94-14 (Sherry Clark Interview) (not mentioning forehead); Doc. 94-16 (C.R. Interview) (not mentioning forehead).

incident. Moreover, no one but Thompson has ever stated that he lacks the prominent forehead attributed to the perpetrator.[101] So the Court cannot fairly say that this discrepancy was within Bolt's ken such that his failure to disclose it was a reckless omission.[102] At most, Bolt should have stated that it was unclear whether Thompson's forehead matched the perpetrator's, and that is how I will reconstruct the Affidavit.

Following development of the record, Thompson suggests one new omission: that the perpetrator was left-handed, and he is not.[103] The record definitively shows that both Clark and C.R. told Bolt that they believed the perpetrator was left-handed before he prepared the Affidavit.[104] A reviewing judge would want to know this fact given the witnesses' insistence in reporting it. However, there is no evidence to suggest that Bolt knew or had any way to know that Thompson was not left-handed at the time he drafted the Affidavit. Because Thompson's right-handedness was also not "in [Bolt's] ken" when he drafted the Affidavit, his failure to include that information was not a "reckless" omission.[105] The Court will reconstruct the Affidavit accordingly.

---

[101] *See* Doc. 94-44 at 155:12-20.

[102] *See Andrews v. Scuilli*, 853 F.3d 690, 698 (3d Cir. 2017) (citing *Wilson*, 212 F.3d at 788).

[103] Doc. 103 at 18-20.

[104] *See* Docs. 94-14, 94-16.

[105] *See Andrews*, 853 F.3d at 698 (citing *Wilson*, 212 F.3d at 786-87).

The newly reconstructed Affidavit reads as follows:[106]

On Monday May 18th 2020 at 1336 hrs Williamsport Bureau of Police were emergency dispatched to an armed home invasion/attempted robbery that just occurred at 951 High St. Units quickly responded to the scene and made contact with victim SHERRY CLARK, who stated that B/M (later identified as CECIL THOMPSON, D.O.B. [redacted]) had knocked on the rear door and asked her 10-year old granddaughter to see "Lisa." When the juveniles replied that no one by that name lived there and began to close the door, ~~THOMPSON~~ **[the perpetrator]** forced his way into the door, pulled out a black/silver handgun, pointed it at the (3) juveniles (a 9-yr old female, 10-yr old female and 15-yr old male) and told them to "get on the ground and be quiet" or he would shoot them. After asking about the other occupants in the residence, ~~THOMPSON~~ **[the perpetrator]** then paraded the trio of juveniles to a second-floor bedroom where CLARK was. ~~THOMPSON~~ **[the perpetrator]** then pointed the firearm at CLARK before telling her and the juveniles to all "be quiet and sit down" inside the room. At that time CLARK quickly grabbed a large nearby flashlight and began swinging it repeatedly at ~~THOMPSON~~ **[the perpetrator]**, which then began a brief altercation in which ~~THOMPSON~~ **[the perpetrator]** struck CLARK in the head, knocking her to the floor. ~~THOMPSON~~ **[The perpetrator]** continuously told CLARK that he would shoot her, however CLARK continued to strike ~~THOMPSON~~ **[the perpetrator]** in the legs. ~~THOMPSON~~ **[the perpetrator]** eventually ran from the bedroom and fled out of the residence.

While on the scene your affiant was provided access to surveillance recordings from cameras attached to the perimeter of the residence. In reviewing recordings ~~THOMPSON~~ **[the perpetrator]** could be observed clad in a grey/black hooded sweatshirt, blue jeans and white sneakers, and walking with his mask below his face and head east on High Street before turning south on 5th Ave. ~~THOMPSON~~ **[The perpetrator]** is observed to stop and watch CLARK and another adult female carrying groceries into house, after which he raises his mask onto his face and approaches the residence. **[The video footage was of moderate quality, and at times it was difficult to make out individuals' facial features at a distance. And in much of the footage, the perpetrator's head was covered by his hood, and his**

[106] Insertions are bolded and bracketed. Deletions are marked with a strikethrough.

> **face was covered by a surgical face mask, so that only the upper half of his face was visible. However, the footage was clear enough that your affiant was able to observe some of the perpetrator's facial features, including a unique and prominent forehead. The eyewitness victims also described the perpetrator as having such a forehead, and believed that he was left-handed.]**
>
> On June 5th 2020 your affiant was contacted by CLARK's family, who stated that they again observed ~~THOMPSON~~ **[the perpetrator]** walking past the residence in work clothing and immediately recognized him. ~~A photo of the suspect was later shown to his employer, who identified the individual that entered the residence as THOMPSON.~~ **[On June 25, 2020, your affiant and several other officers raided CECIL THOMPSON's place of employment, Rose View nursing home, with weapons drawn. After lowering our weapons and standing down, your affiant showed THOMPSON's employer a moderate-quality photograph of an individual wearing a kitchen worker's smock and pants and a surgical mask and asked whether she could identify the subject. She stated that the photograph depicted THOMPSON. Your affiant cannot definitively say that THOMPSON has the same unique and prominent forehead as the perpetrator, nor that he is left-handed.]**

The problem with this reconstructed Affidavit is immediately apparent when considered against my prior opinions in this matter. As I have noted before, "an eyewitness identification . . . satisfies probable cause unless it is unreliable or undermined by exculpatory evidence."[107] But here, although the victim eyewitnesses identified the man who subsequently walked by their house and was captured in the surveillance photos as the perpetrator, that identification lacks any connection to Thompson. Cooper's identification would provide that link and establish probable cause if she had identified Thompson as the subject of one of those surveillance

[107] *Pinkney*, 95 F.4th at 749 (citing *Wilson*, 212 F.3d at 790).

photos. But, given her deposition testimony that she had never seen any of the photos provided by the victims, the bridge from the victims to Thompson is still absent: the Affidavit is unable to explain how Bolt acquired the picture of Thompson that he showed to Cooper, or how that photo has any relation to the crime. Thus, it remains true that "the reconstructed affidavit exposes that Bolt never described how Thompson was identified."[108] And a magistrate presented with this Affidavit would therefore have "no basis on which to conclude that there is a 'fair probability' that Thompson committed the crime."[109] So a jury who believed Cooper's testimony could reasonably find a lack of probable cause.

Defendants offer several other bits of information that they contend establish probable cause, but none is cognizable in this analysis. First, they argue that the Sherriff's deputies' stop was an independent identification of Thompson that supports probable cause.[110] But that stop only established that Thompson lived in the general area of the crime and bore a resemblance to the perpetrator's description—information that is far too vague to establish probable cause to believe that he committed the crime—and in any event it was not mentioned in the Affidavit, so I will not consider it in analyzing whether the Affidavit was deficient.[111] Second, they

108 Doc. 74 at 27.
109 *Id.* at 28.
110 Doc. 98 at 17, 20.
111 *See* Doc. 74 at 22-23 (noting that additional evidence should only be included when it adds "context" to the recklessly omitted information).

contend that Magisterial District Judge Frey's decision to bind the counts over for trial after the preliminary hearing (and thus, the evidence presented at the preliminary hearing) establishes probable cause.[112] But as I have explained before, post-arrest information is irrelevant to this analysis because "a court does not evaluate probable cause in hindsight."[113] Although not expressly argued, Sierra's identification of Thompson in a photo array and Thompson's own agreement that he is the person in the victims' post-incident surveillance photos are irrelevant because they also post-date the swearing of the Affidavit.[114]

Finally, as I have also previously noted, on these facts, qualified immunity does not bar Thompson's Section 1983 claims.[115] An individual's Constitutional rights not to be arrested or prosecuted without probable cause are clearly established in the Third Circuit, and "no reasonable officer would have covered up a lack of probable cause by recklessly disregarding the truth in an affidavit."[116] Similarly, given that there is evidence from which a jury could conclude that Bolt recklessly

---

112 Doc. 98 at 20-21.

113 Doc. 74 at 19 (quoting *Florida v. Harris*, 568 U.S. 237, 249 (2013)); *Brooks v. Kingsboro*, No. 1:25-CV-0545, 2026 WL 1165783, at *4 (M.D. Pa. Apr. 29, 2026) (citing *Alburg v. Jones*, 784 F. Supp. 3d 775, 790 (E.D. Pa. 2025)); *cf. Dempsey*, 594 F.3d at 471 ("[W]e look only to the information available to the officer at the time of the swearing of the affidavit of probable cause.").

114 The Court agrees with Defendants that these direct identifications by a victim eyewitness and Thompson himself undoubtedly established probable cause to believe Thompson committed the crime. The fact that probable cause was established shortly after Thompson's arrest may bear significantly on the damages that he can recover. But, again, the post-arrest proceedings cannot rescue the arrest itself.

115 Doc. 74 at 28.

116 *Pinkney*, 95 F.4th at 749-50 (citing *Andrews*, 853 F.3d at 705 and *Lippay v. Christos*, 996 F.2d 1490, 1504 (3d Cir. 1993)).

disregarded the truth when he prepared the Affidavit, and therefore committed "willful misconduct,"[117] Pennsylvania Political Subdivision Tort Claims Act immunity does not bar the related state tort claims either.[118]

Probable cause is a question for the jury unless the evidence is such that "a reasonable jury could not find a lack of probable cause."[119] Viewing the evidence in the light most favorable to Thompson, a jury could find that the reconstructed Affidavit failed to establish probable cause. Accordingly, the motion for summary judgment as to Bolt is denied in its entirety.

**2. Williamsport**

A municipality may be held liable under Section 1983 if its municipal policy, custom, or training, or lack thereof, was "the moving force of the constitutional violation."[120] Where the claim is one for deficient training, as is the case here, the plaintiff must show that "the [municipality's] failure to train reflects deliberate indifference to the constitutional rights of its inhabitants."[121]

---

[117] *See Thompson v. Wagner*, 631 F. Supp. 2d 664, 688 (W.D. Pa. 2008) (reasoning that providing false information in an affidavit of probable cause met the "willful misconduct" exception to PSTCA immunity (citing *Overstreet v. Borough of Yeadon*, 475 A.2d 803 (Pa. Super. Ct. 1984))); *cf. Pomykacz v. Borough of West Wildwood*, 438 F. Supp. 2d 504, 515 (D.N.J. 2006) (reaching similar conclusion applying New Jersey Tort Claims Act).

[118] *See also* 42 Pa. Cons. Stat. § 8550 (exception to immunity for acts done with "actual malice"); *Kelley v. Gen. Teamsters, Chauffeurs, and Helpers, Local Union 249*, 544 A.2d 940, 941 (Pa. 1988) ("Malice may be inferred from the absence of probable cause." (citing *Hugee v. Pa. R.R. Co.*, 101 A.2d 740, 743 (Pa. 1954))).

[119] *Dempsey*, 834 F.3d at 466 (quoting *Montgomery*, 159 F.3d at 124).

[120] *Monell v. New York Dep't of Social Servs.*, 436 U.S. 658, 694-95 (1978); *City of Canton v. Harris*, 489 U.S. 378, 388-92 (1989).

[121] *City of Canton*, 489 U.S. at 392.

Generally, to show such deliberate indifference, the plaintiff must identify "[a] pattern of similar constitutional violations by untrained employees."[122] Thompson briefly attempts to establish the existence of a "widespread custom of officers recklessly making material omissions and false assertions in arrest warrant affidavits" by asking the Court to infer that such conduct is common based on the fact that Bolt is an experienced police officer but, reading the record in Thompson's favor, erred in this case and could not explain why.[123] That argument is egregiously wrong: "A policy cannot ordinarily be inferred from a single instance of illegality such as a first arrest without probable cause."[124] Binding Circuit precedent prohibits the drawing of such an inference,[125] and to permit that argument to proceed would also allow plaintiffs to end-run the distinct method of analyzing *Monell* claims under a single-incident theory.[126] Thompson's attempt to establish a policy or custom through inference fails.

---

[122] *Connick v. Thompson*, 563 U.S. 51, 62 (2011) (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997)).

[123] Doc. 103 at 25-26 ("If a detective with many years of experience claims that there is no problem with such a deficient affidavit, it can be inferred that either the City's training is deficient, or else that there is an unofficial custom of recklessly omitting material information and asserting falsehoods in affidavits for the purpose of obtaining an arrest warrant.").

[124] Doc. 74 at 31 (quoting *Losch v. Borough of Parkesburg*, 736 F.2d 903, 911 (3d Cir. 1984)).

[125] *Losch*, 736 F.2d 903; *see also Forrest v. Parry*, 930 F.3d 93, 106 (3d Cir. 2019) ("[I]f alleging a custom, the plaintiff must evince a given course of conduct *so well-settled and permanent as to virtually constitute law*." (citing *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)) (emphasis added)).

[126] *See City of Canton*, 489 U.S. at 390 n.10.

Because Thompson identifies one possible constitutional violation, his claim can only advance under the single-incident framework. For single-incident liability, the plaintiff must show that "the situation [is likely to] recur and [it is] predictab[le] that an officer lacking specific tools to handle that situation will violate citizens' rights."[127] In my prior decision, I noted that a "failure to train on the warrant-creation process" could meet this standard because it "would foreseeably cause similar violations to recur as officers author more affidavits in the future."[128]

At summary judgment, Thompson's burden is to come forward with evidence of an actual failure in the municipality's training.[129] But the only evidence in the record indicates that Williamsport does provide training on "what information to put in" an affidavit of probable cause, and the police academy trains on the same issue.[130] Thompson cites two Williamsport Bureau of Police policy documents, and contends that the document relating to "Arrest Warrants" is woefully inadequate because it does not mention the term "probable cause."[131] But in the same breath he acknowledges that the "search warrant policy provides clear guidance on how to protect citizens' constitutional rights and what to include in an affidavit."[132]

---

[127] *Bryan Cnty.*, 520 U.S. at 409.
[128] Doc. 74 at 32.
[129] *Forrest*, 930 F.3d at 105-06; *see Carter v. City of Phila.*, No. 20-CV-0545, 2021 WL 5822996, at *4 (E.D. Pa. Dec. 8, 2021) (citing *City of Canton*, 489 U.S. at 382).
[130] Doc. 94-40 at 23:17-24:14.
[131] Doc. 103 at 26; Doc. 103-3 (Arrest Warrant Policy).
[132] Doc. 103 at 26; Doc. 103-2 (Search Warrant Policy).

The documents reflect that the "Arrest Warrant" policy is essentially entirely concerned with the internal procedural steps for when to seek an arrest warrant, how to serve an arrest warrant, and how to document those steps in a case file.[133] The Court agrees with Thompson that the "Search Warrant" policy provides ample training on how to establish probable cause and the need to do so in a search warrant application.[134] But Thompson ignores that police officers have access to *both* of these policy documents and that these three-page documents are just part of the broader training that the officers receive. To assume that officers completely forget the concededly adequate training on what constitutes probable cause for a search warrant when they apply for an arrest warrant is entirely unrealistic and impractical. This is all the truer considering that, when seeking an arrest warrant, an officer transcribes the relevant facts on a document titled "AFFIDAVIT of PROBABLE CAUSE."[135] Even if Williamsport has not put a full description of probable cause in every document where it might be relevant, it does adequately train on the concept in general, and the record indicates that officers are well aware of when they are required to establish probable cause. On that basis, the Court cannot conclude that the training Williamsport provides, even if inadequate, is so deficient that it was "plainly obvious" that constitutional violations would result.[136]

---

[133] Doc. 103-3.
[134] Doc. 103-2.
[135] Doc. 94-29 at 6.
[136] *See Bryan Cnty.*, 520 U.S. at 409-11.

Furthermore, Thompson agrees, as he must, that Williamsport provides at least some training on this issue. So his contention is essentially "that a different training program than the one in place would have been more effective."[137] To succeed on that type of argument, Thompson must "identify a failure to provide *specific training*"; simply arguing that the municipality "could have" provided "better" or "additional training" is not enough.[138] Thompson does not even attempt to identify what specific better training Williamsport should provide. So his argument fails for this additional reason.

Accordingly, Williamsport is not liable for a failure to train, and its motion for summary judgment is granted.

## III. CONCLUSION

For the above-stated reasons, the Defendants' motion for summary judgment is granted in part and denied in part.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[137] *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 125 (3d Cir. 2003).
[138] *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1030 (3d Cir. 1991).